**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| ECC CENTCOM Constructors, LLC,  )<br>  )<br>  )<br>Plaintiff,  )<br>  )<br>v.  )<br>  )<br>THE UNITED STATES  )<br>  )<br>Defendant.  ) | Case No. 21cv1169<br>(Judge Tapp) |

**SECOND AMENDED COMPLAINT**

Plaintiff, ECC CENTCOM Constructors, LLC (hereafter "ECC CENTCOM"), by the undersigned counsel, alleges as follows for its Second Amended Complaint:

1. ECC CENTCOM is organized under the laws of the State of Delaware.

2. Defendant is the United States of America ("Defendant"), acting by and through the Middle East District ("MED") of the U.S. Army Corps of Engineers ("USACE").

3. ECC CENTCOM submitted a certified claim on February 7, 2022, which supplemented its original certified claim of December 31, 2019 which demanded $2,534,827.23 for 273 days of delay damages, by asserting breach damages in the amount of $11,369,865.30; the claims also demanded withdrawal of all assessed liquidated damages, conversion of a wrongful termination for default to one for convenience, and withdrawal and reevaluation of the CPARS rating, all for work performed on Contract No. W912ER-11-D-0010, Task Order 0006, for construction of the Transient Quarters and Enlisted & Officer Dining Facility in Manama, Bahrain ("TQ Task Order 0006" or "TQ and DFAC Task Order").

1

4. On April 8, 2022, a USACE Contracting Officer from the MED issued a Contracting Officer's Final Decision that denied ECC CENTCOM's claim in its entirety.

5. This Court has jurisdiction over the denial of this February 7, 2022 certified claim that supplemented the December 31, 2019 certified claim, pursuant to 28 U.S.C. § 1491 and the Contract Disputes Act of 1978, ("CDA"), 41 U.S.C. §601 *et seq.*

**Contractual Background**

6. USACE awarded ECC CENTCOM Contract No. W912ER-11-D-0010, a Multiple Award Task Order Contract (MATOC), on June 16, 2011, for general construction and construction related services, including design-build services.

7. USACE issued a Request For Proposals (RFP) for Task Order 0006 on the MATOC, on November 29, 2012, for the design and construction of the Transient Quarters and Enlisted and Officer Dining Facilities (DFAC) project.

8. ECC CENTCOM submitted its proposal in response to the RFP for Task Order 0006 on February 19, 2013.

9. As required by the RFP, ECC CENTCOM's proposal designated key personnel for management of the project.

10. ECC CENTCOM planned mobilization of key personnel to the project site early in performance so they could begin critical site survey and

geotechnical activities necessary to start the fast-track civil and foundation designs.

11. ECC CENTOM's proposal and its initial schedule did not contemplate any delays to commencement of the project due to a bid protest.

12. On September 11, 2013, USACE awarded ECC CENTCOM Task Order 0006, in the amount of $40,301,215.55, for the design and construction of the TQ and DFAC in Manama Bahrain.

### **Count I – USACE's Violation of the Duty of Good Faith and Fair Dealing**

13. Task Order 0006 required ECC CENTCOM to commence performance within 20 days of receipt of the Notice to Proceed, and complete all work within 710 calendar days of receipt of the Notice to Proceed.

14. On September 24, 2013, USACE notified ECC CENTCOM that a bid protest had been filed related to Task Order 0006, and that the bid protest had to be resolved before a Notice to Proceed could be issued.

15. By its letter of September 24, 2013, USACE also instructed ECC CENTCOM "not to incur any costs associated with the Task Order."

16. As a result of the USACE directive to not incur any costs, and because of the unknown duration of the bid protest, ECC CENTCOM reasonably chose to re-assign its key personnel to other projects.

17. On December 30, 2013, GAO denied the bid protest and USACE immediately lifted the suspension of work.

18. On January 2, 2014, USACE issued the Notice to Proceed, thereby establishing a contract completion date of December 13, 2015.

19. The RFP for Task Order 0006 contained a "fast-track" provision for the design and provided for measures necessary to expedite the schedule.

20. Task Order 0006 states that subject to coordination, security and submittal requirements in this contract, the Contractor will have access to the construction site immediately after Notice to Proceed.

21. Task Order 0006 states that prior to starting any "major feature of work," the Contractor will be required to furnished and install temporary chain link fences for safety and security reasons.

22. On January 9, 2014, ECC CENTCOM gave a Notice to Proceed to its subcontractor Kooheji Constructors ("Kooheji"), to immediately begin site survey work, the geotechnical survey, to do test piles, and to install temporary fencing, project office buildings, utilities, and other mobilization activities.

23. On January 9, 2014, ECC CENTCOM also informed USACE's Project Manager of its plan to commence work the week of January 20, 2014, with site survey and geotechnical surveys.

24. As a part of its January 9, 2014 request, ECC CENTCOM also requested authorization for approval of available ECC CENTCOM staff to conduct the pre-construction activities such as the site survey, geotechnical survey and location of utilities, with the understanding that the personnel in ECC CENTCOM's Technical Proposal would be available when construction activities started. This is similar to the process ECC CENTCOM had used, and USACE had approved, on the adjacent Bachelor's Enlisted Quarters

(BEQ) Task Order 0002 project, which had been awarded on the same MATOC a year earlier.

25. USACE never responded to ECC CENTCOM's request for approval of personnel to oversee pre-construction activities, and therefore ECC CENTCOM could not commence these activities as planned.

26. On February 5, 2014, ECC CENTCOM submitted a formal request for approval from the Contracting Officer's Representative ("COR"), for interim personnel to begin mobilization activities, including use of qualified supervisory personnel to perform the topographic and geotechnical surveys that were critical for collection of data for the design.

27. USACE never responded to ECC CENTCOM's February 5, 2014 request.

28. On February 25, 2014, ECC CENTCOM again requested approval for site access to begin mobilization activities, now on March 9, 2014; this request included backup plans for personnel if the Bahraini visa process was delayed.

29. On March 4, 2014, ECC CENTCOM resent its request for approval of interim personnel to the Contracting Officer ("CO"), to perform non-construction related activities to begin mobilization.

30. On March 5, 2014, the CO denied ECC CENTCOM's request, and stated that ECC CENTCOM could only start initial mobilization activities with key personnel listed in the Technical Proposal, alleging that substitution of

personnel would create an unfair advantage to those firms that also bid this project.

31. By March 13, 2014, ECC CENTCOM's design meeting notes documented that the design schedule was now pushed beyond the planned March 11, 2014 date, due to lack of site survey and geotechnical information, and yet to be resolved floor plan layout changes requested by NAVFAC.

32. On March 13, 2014, ECC CENTCOM submitted an additional request for Key Personnel substitution, with personnel fully qualified to manage the project.

33. USACE never responded to the March 13, 2014 request.

34. On March 20, 2014, ECC CENTCOM again requested USACE to at least consider Key personnel substitutions as temporary replacements to perform survey activities.

35. On March 24, 2014, ECC CENTCOM notified USACE of the lack of response and resulting delays, reserving its rights to submit a request for equitable adjustment.

36. On April 1, 2014, ECC CENTCOM again asked the Contracting Officer to approve the personnel previously requested on an interim basis so that work could commence.

37. On April 1, 2014, the Contracting Officer approved the key personnel ECC CENTCOM submitted, but this approval was on an interim basis, until he made a final determination.

38. On April 9, 2014, USACE's Contracting Officer disapproved ECC CENTCOM's proposed permanent Project Manager because he was also Project Manager on the adjacent Bachelor's Enlisted Quarters contract; this action was contrary to the terms of Task Order 0006, which had no requirement that the Project Manager have duties on only one project.

39. On April 16, 2014, ECC CENTCOM informed the Contracting Officer that previously approved interim personnel had not been approved for visas because the Bahraini immigration system had been off-line for the month of March; therefore ECC CENTCOM requested approval of alternate personnel who did not have Bahraini visa requirements.

40. On May 2, 2014, ECC CENTCOM proposed additional substitute personnel for the Site Safety & Health Officer (SSHO), as the original SSHO had his visa denied with no reason given.

41. On May 20, 2014, ECC CENTCOM notified the Contracting Officer that the interim Quality Control Manager needed to be changed, which request was approved by the CO on May 22, 2014.

42. On June 4, 2014, ECC CENTCOM submitted an additional request for new permanent key personnel for Quality Control Manager (QCM) and SSHO; these requests were approved on June 23 and 24.

43. Pursuant to the terms of Task Order 0006 and the MATOC, and its duty of good faith and fair dealing, USACE had an obligation to reasonably review and timely approve the proposed interim key personnel that ECC CENTCOM proposed; USACE breached all of these obligations by failing to

review and approve ECC CENTOM's proposed interim personnel in a timely manner.

44. As a direct result of USACE's failure to reasonably review and timely approve the proposed interim key personnel that ECC CENTCOM proposed, the start of critical project activities, including but not limited to site survey and geotechnical investigation, and associated design work was delayed at least 59 days.

45. The delay of at least 59 days to the critical path resulted from USACE's failure to reasonably review and timely approve the proposed interim key personnel of ECC CENTCOM.

46. As a direct result of USACE's failure to reasonably review and timely approve the proposed interim key personnel, and the associated delays, ECC CENTCOM's subcontractor Kooheji was unable to timely mobilize its two planned piling crews.

47. By the time Kooheji was able to mobilize its piling crews after the above delays caused by USACE, Kooheji was only able to mobilize one of its two planned piling crews, causing further critical path delays of 20 days, as Kooheji was forced to perform all of the piling work with one crew.

48. As a direct result of USACE's failure to reasonably review and timely approve interim key personnel of ECC CENTCOM suffered a lack of progress from June 2014 through February 2015 resulting in at least 117 days of additional delay to critical path activities.

49. USACE's failure to reasonably review and timely approve the proposed interim key personnel of ECC CENTCOM was a material breach of USACE's duty of good faith and fair dealing.

50. USACE did not correct its failure to reasonably review and timely approve the proposed interim key personnel of ECC CENTCOM, and never provided a time extension due to this issue.

51. At the time that USACE declared ECC CENTCOM to be in default of the terms of the Contract, USACE itself was in material breach of its contractual obligations due to its violation of the duty of good faith and fair dealing related to its failure reasonably review and timely approve proposed interim key personnel.

52. As a direct result of USACE's failure to reasonably review and timely approve the proposed interim key personnel, ECC CENTCOM suffered contractual delay damages of $1,076,343.33 and 196 days of delay.

53. As a direct result of USACE's failure to reasonably review and timely approve the proposed interim key personnel and the resulting improper termination for default, ECC CENTCOM suffered breach damages of $11,369,865.30.

Wherefore, based upon USACE's material breach of its contractual obligations and its violation of the duty of good faith and fair dealing, ECC CENTCOM is entitled to recover its breach damages; additionally, because of USACE's prior material breach, its termination for default is legally invalid and must be converted to a termination for convenience.

## Count II – Breach Damages Due to Nationwide Material Shortages Exacerbated by Other Delays

54. ECC CENTOM repeats the assertions in paragraphs 1-53 above as if fully stated herein.

55. Task Order 0006 consisted of transient quarters' buildings and dining facilities buildings, all designed to be constructed using Concrete Masonry Unit (CMU) block walls.

56. ECC CENTCOM required approximately 275,000 CMU blocks for construction of the various buildings on the Task Order 0006 project.

57. ECC CENTCOM planned to complete the CMU block work over a period of 151 days, requiring an average daily supply of approximately 1821 CMU blocks.

58. After completion of the pilings, the next critical path activity on the Task Order 0006 project was construction of the CMU walls for the various buildings.

59. From the time that ECC CENTCOM started the CMU work in the winter of 2015 through September of 2015, there was a nationwide shortage of sand and aggregate in Bahrain, which affected the ability of ECC CENTCOM's suppliers to produce and deliver the quantity of CMU blocks needed for timely and efficient construction of the Task Order 0006 project.

60. ECC CENTCOM took all available steps to increase its supply of CMU blocks, including adding suppliers, but was never able to receive the average daily supply of CMU blocks necessary to meet its schedule;

10

suppliers were only able to deliver approximately 1/3 of planned quantities of CMU blocks from April through July 2015, and even fewer CMU blocks in August 2015.

61. The shortage of CMU blocks continued through September 2015.

62. Because of the nationwide shortage of sand and aggregate in Bahrain through September 2015, and the resulting impact on ECC CENTCOM's ability to obtain the necessary quantities of CMU blocks to timely and efficiently build the buildings on Task Order 0006, ECC CENTCOM was delayed in meeting its schedule.

63. ECC CENTCOM's critical path project delays due to the nationwide shortage of sand and aggregate in Bahrain were beyond the control and without the fault of ECC CENTCOM.

64. The shortage of sand and aggregate for CMU fabrication in Bahrain in 2015, which relies upon importation of materials, was widely known to ECC CENTCOM and USACE, as the matter was the subject of published articles in Bahrain.

65. Internal USACE communications also documented its knowledge of the shortage of sand and aggregate in Bahrain in 2015, which relies upon importation of materials. Those communications illustrate the Contracting Officer's investigation and verification of the nationwide shortage impacting the Project.

66. While USACE had actual knowledge of the shortage of sand and aggregate in Bahrain in 2015, ECC CENTCOM also gave USACE formal notice of the

problem in correspondence of May 17, 2015, June 21, 2015, and July 22, 2015.

67. In its notice documentation, ECC CENTCOM informed USACE of the impact to the project from the nationwide shortage of sand and aggregate in Bahrain, which was impacting its ability to obtain the quantities of CMU blocks necessary to meet its schedule.

68. As a direct result of the critical path delays caused by the nationwide shortage of sand and aggregate in Bahrain, the project was delayed 65 days and ECC CENTCOM incurred delay costs of $671,597.69.

69. USACE never granted a time extension due to the delays to the critical path of the project caused by the nationwide shortage of sand and aggregate in Bahrain.

70. The breach of good faith and fair dealing included in Count I of this Complaint further caused ECC CENTCOM delays, because the Count I delays pushed critical path work on CMU blocks into 2015, resulting in delays due to the nationwide shortage of sand and aggregate in Bahrain that would not have occurred but for the Count I delays.

71. Once the issues related to the nationwide shortage of sand and aggregate ended in September 2015, ECC CENTCOM was able to achieve the CMU placement rates anticipated in its Approved Baseline Schedule; however, critical path delays had already occurred and could not be mitigated.

72. As a direct result of the facts described in Count I and Count II of this Complaint, ECC CENTCOM suffered delay days of 196 calendar days and

delay damages of $1,076,343.33 in Count I, plus 65 calendar days of delay and delay damages of $61,597.69 in Count II.

73. As a direct result of the facts described in Count I and Count II of this Complaint, ECC CENTCOM suffered breach damages of $11,369,865.30.

Wherefore, based upon the facts described in Count I and Count II of this Complaint, and USACE's material breach of its contractual obligations due to its violation of the duty of good faith and fair dealing, ECC CENTCOM is entitled to recover its breach damages of $11,369,865.30; additionally, because of USACE's prior material breach, its termination for default is legally invalid and must be converted to a termination for convenience.

### Count III – Breach Due to Improper Issuance of Unilateral Modification No. 16

74. ECC CENTOM repeats the assertions in paragraphs 1-73 above as if fully stated herein.

75. On December 29, 2015, 16 days after the original contract completion date, USACE issued unilateral Modification No. 16, adding a sanitary lift station to the Task Order 0006 project.

76. Unilateral Modification No. 16 was issued in the amount of $245,595.00, with no time extension for the increase in the scope of work.

77. ECC CENTCOM performed a time impact analysis of Unilateral Modification No. 16 and determined that it caused 33 days of delay to completion of the Task Order 0006 project.

78. USACE failed to properly analyze the time impact of Unilateral Modification No. 16 and never granted a time extension.

79. USACE's issuance of Unilateral Modification No. 16 without properly analyzing the time impact that modification was a constructive change to Task Order 0006.

80. As a direct result of the constructive changes due to Unilateral Modification No. 16, ECC CENTCOM was entitled to delay damages of $308,168.52, and a time extension of 33 days.

81. USACE's issuance of Unilateral Modification No. 16 without properly analyzing the time impact of that modification was a breach of the duty of good faith and fair dealing.

82. As a direct result of the facts described in Counts I, II, and III of this Complaint, ECC CENTCOM suffered breach damages of $11,369,865.30.

83. After terminating ECC CENTCOM for default, USACE granted time extensions to the completion contractor for Unilateral Modification No. 16, for the amount of days that ECC CENTCOM had requested, thereby acknowledging that a time extension of 33 days was due for performance of Unilateral Modification No. 16.

   Wherefore, based upon the facts described in Count III of this Complaint, and USACE's material breach of its contractual obligations due to its violation of the duty of good faith and fair dealing, ECC CENTCOM is entitled to recover its delay damages of $308,168.52 and its breach damages of $11,369,865.30; additionally, because of USACE's prior material breach, its

termination for default is legally invalid and must be converted to a termination for convenience.

### Count IV – Improper CPARS Rating

84. ECC CENTOM repeats the assertions in paragraphs 1-83 above as if fully stated herein.

85. During the course of performance, USACE personnel in Bahrain who had responsibility for oversight of the contract, including the Contracting Officer's Representative (COR) and Administrative Contracting Officer (ACO), recommended that ECC CENTCOM be given an overall satisfactory CPARS rating.

86. USACE's COR and ACO were familiar with the facts recounted in paragraphs 1-89 above, as they were on-site staff who were familiar with the obstacles ECC CENTCOM had overcome in performing the work.

87. On April 19, 2016, a USACE Contracting Officer located in the United States, who ECC CENTCOM asserts upon information and belief, had never been to the project in Bahrain, ignored the recommendation of knowledgeable on-site USACE representatives and issued an overall Unsatisfactory performance rating in the CPARS.

88. The Unsatisfactory performance rating in the CPARS was not supported with required factual information.

89. The Unsatisfactory performance rating in the CPARS failed to consider any of the facts identified in paragraphs 1-83 of this Amended Complaint in violation of FAR 42-1503(b)(4), which requires that "Each factor and

subfactor used shall be evaluated and a supporting narrative provided" which "must reflect the definitions in the tables Table 42-2 or Table 42-3" to support an Unsatisfactory determination.

90. The Unsatisfactory performance rating in CPARS was issued in violation of FAR 42.1503(d), as the final CPARS rating was never submitted to ECC CENTCOM for comment, nor was it submitted to the Contracting Officer's superior for resolution of any disputes between the parties.

91. The Unsatisfactory performance rating in CPARS for Task Order 0006 was arbitrary and capricious.

Wherefore, based upon the facts described in Count IV of this Complaint, ECC CENTCOM is entitled to have the CPARS rating for Task Order 0006 rescinded.

### Count V – Improper Termination for Default

92. ECC CENTOM repeats the assertions in paragraphs 1-91 above as if fully stated herein.

93. On December 30, 2015, USACE issued a Show Cause Letter, requiring ECC CENTCOM to provide a recovery schedule, and provide USACE a rationale for the delays to the Task Order 0006 project through that date.

94. ECC CENTCOM responded on January 9, 2016, with the requested recovery schedule and a detailed explanation of the events to date on the Task Order 0006 project that had caused delays, including time impact analyses.

95. ECC CENTCOM continued to work from the date of the show cause letter through March 2016, reaching 67% completion of the Task Order 006 through that date.

96. On April 19, 2016, a Contracting Officer located in the United States terminated the contract for default, without fair and timely consideration of ECC CENTCOM's explanations in its January 9, 2016 letter, nor consideration of ECC CENTCOM's performance from January through March 2016, nor any of the issues identified in this Complaint.

97. At the time of the default on April 19, 2016, ECC CENTCOM was not late in its performance, when the days of delay asserted in the certified claim are considered.

98. Prior to the time of the default on April 19, 2016, USACE was in prior material breach of the duty of good faith and fair dealing for the reasons identified in this Complaint.

Wherefore, based upon the facts described in Count VI of this Complaint, ECC CENTCOM is entitled to have the termination for default converted to a termination for convenience.

## **CONCLUSION AND DEMAND FOR RELIEF**

WHEREFORE, Plaintiff requests the Court to find that ECC CENTCOM is entitled to a judgment on Counts I, II and III for 294 days of delay damages of $2,056,109.55 breach damages of $11,369,865.30 due to Defendant's violation of the duty of good faith and fair dealing asserted in its February 7, 2022 certified claim which supplemented its December 31, 2019 certified

claim; on Count IV, for withdrawal of the improperly issued CPARS performance rating as requested in its February 7, 2022 and December 31, 2019 certified claims; on Count V, for conversion of the improper termination for default to a termination for convenience as requested in its February 7, 2022 and December 31, 2019 certified claims; and that ECC CENTCOM is entitled to interest, and costs as allowed by law, and such other relief as the Court deems appropriate.

Dated: __4/13/23_____  _____
R. Dale Holmes, Esquire
Cohen Seglias Pallas Greenhall
& Furman PC
1600 Market Street, 32md Floor
Philadelphia, PA 19103
Tel:   215-564-1700
Fax:   267-238-4456
Email: dholmes@cohenseglias.com

Counsel for ECC CENTCOM

Co-Counsel:

Ryan Boonstra, Esquire
Michael H. Payne, Esquire
Cohen Seglias Pallas Greenhall & Furman PC