No. 21-1169C
(Judge Tapp)

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

ECC CENTCOM CONSTRUCTORS, LLC,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

---

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

---

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. MCCARTHY
Director

ERIC P. BRUSKIN
Assistant Director

OF COUNSEL:

Rebecca Bockmann
Assistant Counsel
United States Army Corps of Engineers
Transatlantic Middle East District
201 Prince Frederick Drive
Winchester, VA 22602

BRET R. VALLACHER
ERIC LAUFGRABEN
BONDURANT ELEY
BRITTNEY WELCH
Trial Attorneys
Commercial Litigation Branch
Civil Division
Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, D.C. 20044

May 26, 2023                                    *Attorneys for Defendant*

TABLE OF CONTENTS

INTRODUCTION ........................................................................................................ 1

STATEMENT OF THE ISSUES ................................................................................... 2

STATEMENT OF THE CASE ...................................................................................... 3

   I.   Background ....................................................................................................... 3

        A.   The MATOC, The Request For Proposal, The Award, And The Protest ..................... 3

        B.   The Substitution Requests And Visa Issues (Claim 1) ................................................ 5

        C.   The Alleged CMU Shortage (Count 2) ....................................................................... 9

        D.   Modification 16 (Count 3) ............................................................................................ 9

        E.   ECC's Untimely Performance, Show Cause Letter, And Termination ....................... 10

        F.   ECC Challenges Its Termination For Default, In Part, On The Basis Of Its Delay Claims, But The ASBCA Denies ECC's Appeal And The Federal Circuit Affirms ............... 11

        G.   A Second Bite At The Apple In The Court Of Federal Claims .................................. 14

ARGUMENT ............................................................................................................... 16

   I.   Standard Of Review ...................................................................................... 18

   II.   ECC's Challenge To Its Termination For Default (Count 5) And Its Delay Claims (Counts 1, 2, And 3) Are Barred Under The Doctrine Of Claim Preclusion .................................. 18

   III.   Issue Preclusion Bars ECC From Disputing The Propriety Of The Default Termination (Count 5) And The Underlying Factual Findings Made By The ABSCA ...................... 25

   IV.   Even If Neither Res Judicata Doctrine Applied, ECC's Challenge To Its Termination For Default (Count 5) Would Still Be Barred By The One-Year Statute Of Limitations To Appeal A Contracting Officer's Final Decision ...................................................... 27

   V.   ECC's $11 Million Of "Breach Damages" Reflects A Termination For Convenience Costs Calculation, Which ECC Cannot Obtain Due To The Default Termination ............ **Error! Bookmark not defined.**

   VI.   Even If Res Judicata Did Not Apply And Even If ECC Could Challenge The Termination At This Juncture, ECC's $11 Million Good Faith And Fair Dealing Claim Would Still Be Barred Because ECC Failed To Submit A Certified Claim Within Six Years Of That Claim Accruing ................................................................................................................... 31

        A.   ECC's $11 Million Good Faith And Fair Dealing Claim Was First Submitted To The Contracting Officer On February 7, 2022 ................................................................... 31

        B.   ECC's $11 Million Good Faith And Fair Dealing Claim Accrued More Than Six Years Prior To ECC's February 7, 2022 Certified Claim ...................................................... 33

   VII.   ECC's Challenge To Its CPARS Ratings (Count 4) Fails As A Matter Of Law ............. 37

CONCLUSION ............................................................................................................ 40

## TABLE OF AUTHORITIES

**Cases**                                                                                                          **Page(s)**

*Ammex, Inc. v. United States,*
   334 F.3d 1052 (Fed. Cir. 2003) ................................................................................. 19, 20

*Anderson v. Liberty Lobby, Inc.,*
   477 U.S. 242 (1986) ................................................................................................... 18

*Ashe v. Swenson,*
   397 U.S. 436 (1970) .............................................................................................. 25, 40

*AT&T Adver., L.P. v. United States,*
   147 Fed. Cl. 478 (2020) .............................................................................................. 18

*Avant Assessment, LLC v. United States,*
   159 Fed. Cl. 632 (2022) ...................................................................................... *passim*

*Banner v. United States,*
   238 F.3d 1348 (Fed. Cir. 2001) ............................................................................. 25, 27

*Bowman Constr. Co. v. United States,*
   154 Fed. Cl. 127 (2021) .............................................................................. 27, 28, 29, 37

*Canpro Invs. Ltd. v. United States,*
   130 Fed. Cl. 320 (2017) .............................................................................................. 33

*Case, Inc. v. United States,*
   88 F.3d 1004 (Fed. Cir. 1996) .................................................................................... 19

*Celotex Corp. v. Catrett,*
   477 U.S. 317 (1986) .............................................................................................. 18, 19

*Dairyland Power Coop. v. United States,*
   16 F.3d 1197 (Fed. Cir. 1994) .................................................................................... 18

*ECC Centcom Constructors, LLC v. Sec'y of Army,*
   779 F. App'x 750 (Fed. Cir. 2019) ...................................................................... 14, 20, 26

*Elec. Boat Corp. v. Sec'y of Navy,*
   958 F.3d 1372 (Fed. Cir. 2020) .................................................................................. 33

*Empire Energy Mgmt. Sys., Inc. v. Roche,*
   362 F.3d 1343 (Fed. Cir. 2004) ....................................................................... 13, 21, 26

*Federated Dep't Stores, Inc. v. Moitie,*
   452 U.S. 394 (1981) ................................................................................................... 19

*Guardian Angels Med. Serv. Dogs, Inc. v. United States,*
809 F.3d 1244 (Fed. Cir. 2016) ............................................................................. 28

*K-Con Bldg. Sys., Inc. v. United States,*
778 F.3d 1000 (Fed. Cir. 2015) ......................................................................... 32, 33

*Kenney Orthopedic, LLC v. United States,*
88 Fed. Cl. 688 (2009) ............................................................................................ 29

*M. Maropakis Carpentry, Inc. v. United States,*
609 F.3d 1323 (Fed. Cir. 2010) ............................................................... 13, 21, 24

*Montana v. United States,*
440 U.S. 147 (1979) ................................................................................................. 19

*Nevada v. United States,*
463 U.S. 110 (1983) .......................................................................... 19, 21, 22, 24

*PCL Const. Servs., Inc. v. United States,*
84 Fed. Cl. 408 (2008) ............................................................................................ 19

*Phillips/May Corp. v. United States,*
524 F.3d 1264 (Fed. Cir. 2008) .................................................... 19, 20, 21, 22

*Roxco Ltd. v. United States,*
60 Fed. Cl. 39 (2004) .............................................................................................. 29

*Scott Timber Co. v. United States,*
333 F.3d 1358 (Fed. Cir. 2003) ......................................................................... 32, 33

*Securiforce International America, L.L.C. v. United States,*
879 F.3d 1354 (Fed. Cir. 2018) ............................................................................. 13

*Sharman Co. v. United States,*
30 Fed. Cl. 231 (1994) ...................................................................................... 28, 30

*Square One Armoring Servs. Co. v. United States,*
162 Fed. Cl. 429 (2022) .......................................................................................... 34

*Sweats Fashions, Inc. v. Pannill Knitting* Co., Inc.,
833 F.2d 1560 (Fed. Cir. 1987) ............................................................................. 18

**Statutes**

41 U.S.C. § 7101 ...................................................................................................... 31

41 U.S.C. § 7103(a)(4) ...................................................................................... 1, 2, 31

41 U.S.C. § 7103(g) .................................................................................................. 27

41 U.S.C. § 7104(b)(3) ........................................................................................ 1, 2

41 U.S.C. § 7107(a) ......................................................................................... 25, 40

**Regulations**

48 C.F.R. § 33.201 ................................................................................................. 34

48 C.F.R. § 42.1503 .......................................................................................... 38.39

48 C.F.R. § 42.1503(b)(4) ..................................................................................... 39

48 C.F.R. § 42.1503(d) ..................................................................................... 38, 39

48 C.F.R. § 49.206-2(b)(4) .................................................................................... 29

FAR 42.1503(d) ..................................................................................................... 37

FAR 42.402-2(a) .................................................................................................... 29

FAR 49.402-3(f) ........................................................................................ 12, 13, 26

FAR 52.249-10 ...................................................................................................... 29

# INTRODUCTION

Pursuant to Rule 56 of the Rules of the United States Court of Federal Claims (RCFC), defendant, the United States, respectfully requests that the Court grant summary judgment in defendant's favor.  There are no genuine issues of material fact in dispute and, for several reasons, the Government is entitled to judgment as a matter of law.

First, plaintiff, ECC Centcom Constructors, LLC's (ECC) challenge to its termination for default (count 5 of ECC's complaint) and its related delay claims (counts 1, 2, and 3) are barred under the *res judicata* doctrine of claim preclusion.  Second, ECC's challenge to the termination for default (count 5) is further barred by the *res judicata* doctrine of issue preclusion. Third, even if ECC's challenge to its termination for default (count 5) were not barred by these *res judicata* doctrines, ECC's challenge would be untimely as it was not filed in this Court "within 12 months from the date of receipt of a contracting officer's decision," as required by the Contract Disputes Act (CDA), 41 U.S.C. § 7104(b)(3).  Fourth, because ECC's challenge to its termination for default is barred and/or untimely, ECC's claim for $11 million in "breach" damages also fails because it impermissibly seeks termination for convenience costs.  Fifth, even if the claim were otherwise valid and not barred by claim preclusion, ECC's $11 million good faith and fair dealing claim (count 1) would still be untimely and must be dismissed because ECC failed to submit that claim to U.S. Army Corps of Engineers (USACE) "within 6 years after the accrual of the claim," as required by the CDA, 41 U.S.C. § 7103(a)(4)(A).  Finally, ECC's challenge to its Contractor Performance Assessment Reporting System (CPARS) ratings (count 4) fails as a matter of law because ECC cannot show that the rating issued by the USACE is erroneous.

For each of these reasons, ECC's claims fail as a matter of law, and judgment should issue in favor of the United States.

## <u>STATEMENT OF THE ISSUES</u>

1.      Whether the doctrine of claim preclusion bars ECC from again challenging its termination for default (count 5) and reviving its delay claims (count 1, 2, and 3) because these claims arise from the same set of transactional facts as ECC's previous litigation against the Government before the Armed Services Board of Contract Appeals (ASBCA), which resulted in a final judgment upon the merits that was affirmed by the Court of Appeals for the Federal Circuit.

2.      Whether the doctrine of issue preclusion bars ECC from again challenging its termination for default (count 5) because the ASBCA already determined that "the contracting officer acted reasonably in terminating [ECC's] contract for failure to complete on time," among other factual issues fully litigated.

3.      To the extent that ECC's claims are not barred by *res judicata* doctrines, whether count 5 must nevertheless be dismissed because ECC failed to challenge its termination for default within one year, as required by 41 U.S.C. § 7104(b)(3).

4.      Because ECC's untimely challenge to its termination for default is barred by *res judicata* doctrines, whether ECC's $11 million "breach" damages calculation fails as a matter of law because it impermissibly seeks a termination for convenience costs?

5.      To the extent that ECC's claims are not barred by *res judicata* doctrines, whether ECC's $11 million good faith and fair dealing claim  (count 1) must nevertheless be dismissed because it is untimely under 41 U.S.C. § 7103(a)(4).

6.      Whether ECC's challenge to its CPARS ratings (count 4) fails as a matter of law because ECC cannot show that USACE erred in issuing its rating.

## STATEMENT OF THE CASE

I. **Background**

    A. **The MATOC, The Request For Proposal, The Award, And The Protest**

On June 16, 2011, the USACE awarded an Indefinite Delivery/Indefinite Quantity Multiple Award Task Order Contract (MATOC) to multiple awardees for design-build and construction projects in the U.S. Central Command Area of Responsibility, under which firm-fixed price task orders could be issued. A1-A303.[1] The MATOC required awardees to use the personnel they identified in their proposal, and stated that substitutions would only be allowed if the contractor "obtain[ed] the Contracting Officer's written consent," which could only obtain when the proposed substitutions had the "level of qualifications and experience submitted in the accepted proposal or . . . required by the Solicitation, whichever is greater."  A251.  The MATOC also provided that obtaining "[e]ntry and exit visas" would be the "sole responsibility of the Contractor" to "assume the risk." A294.

On November 29, 2012, USACE issued a Request for Proposal (RFP) for Task Order 6 (Contract No. W912ER-11-D-0010-0006), seeking proposals for design and construction of the Transient Quarters (TQ) and Dining Facility (DFAC) in Manama, Bahrain. A304-A360.  The RFP indicated the importance of a competent, experienced management team (Key Personnel) to carry out this international construction project.  The RFP identified the Projection Manager, Site Superintendent, Quality Control Systems Manager, and Site Safety Health and Environmental Officers as "Key Personnel," and stated that "[m]ore weight will be given for: Key Personnel with experience on at least three (3) projects of similar size, scope, and complexity" and for

---

[1] "A_" refers to the bold pagination at the bottom of each page of our Appendix attached to this motion.

"Key Personnel with ten (10) or more years of relevant job experience that is related to the position they will hold on this project." A310.  The RFP, as amended, required that offerors keep their proposals valid until May 20, 2013.  A304 ("All proposals shall be valid for 90 days after the proposal submission due date."); A361 ("Request for Proposal due date is hereby extended from 14-January-2013 to 19-February-2013").  Later, ECC agreed to extend the validity of its proposal until September 17, 2013. A424, A423.

On February 19, 2013, ECC submitted its proposal in response to the RFP for Task Order 6.  A363–422.  Therein, ECC identified the following Key Personnel: Bruce Fox as Project Manager; Scot House as Site Superintendent; Mohammad Al Chalabi as Quality Control Systems Manager; and Rene Garo as Site Safety Health and Environmental Officer.  A371–372.

On September 11, 2013, USACE awarded ECC the Firm Fixed-Price Design Build Contract (Contract No. W912ER-11-D-0010-0006) in the amount of $40,301,215.55, for the design and construction of the TQ and DFAC. A426–428; A429–2038.  Task Order 0006 required ECC to commence performance within 20 days of receipt of the Notice to Proceed, and to complete all work within 710 calendar days of receipt of the Notice to Proceed.  A442.

Although ECC's complaint alleges that a subsequently filed bid protest pushed back its anticipated mobilization on Task Order 6 such that it had to re-assign Key Personnel, contemporaneous communications reveal that immediately after receiving the award—and before any bid protest was filed—ECC anticipated starting when it ultimately did in January 2014.  A2040 ("We are likely looking at mobilizing in January time frame.")  And ECC personnel anticipated that a bid protest would be filed the day after the award. A2046.

On September 24, 2013, the Contracting Officer notified ECC that USACE had indeed received a bid protest for the award of the Contract before the Government Accountability Office

(GAO), and further informed ECC that "[u]ntil resolution of the [protest] is satisfactory completed, Notice to Proceed (NTP) will not be issued for the subject task order." A2049.  ECC personnel were aware that the general timeframe for resolution of a bid protest before the GAO was 100 days and anticipated that the bid protest would be resolved around January 2, 2014, such that, in line with ECC's pre-protest expectations, the project would start in January 2014. A2050.

On December 30, 2013, USACE notified ECC that the GAO had denied the post-award protest on December 27, 2013, and that "the Suspension of Performance for the subject project has been lifted."  A2054.  On January 2, 2014, USACE issued the Notice to Proceed, which set a completion date of December 13, 2015. A2055–2056.

### B.  The Substitution Requests And Visa Issues (Claim 1)

As explained above, ECC proposed using the following Key Personnel: Bruce Fox as Project Manager, Scot House as Site Superintendent, Mohammad Al Chalabi as Quality Control Systems Manager, and Rene Garo as Site Safety Health and Environmental Officer (SSHO). A371–372.  The record evidence establishes, however, that ECC did not plan to actually assign these people to the project.[2]

Although ECC proposed specific Key Personnel, ECC immediately sought to replace them with less experienced staff.  As an initial matter, and contrary to the terms of the MATOC, in February of 2014, ECC attempted to substitute its Key Personnel by seeking permission from the Contracting Officer Representative—not the Contracting Officer. See, e.g., A2057, A2097.  It was not until March 4, 2014, that ECC began to seek permission from USACE's Contracting Officer, Peter DeMattei, to substitute its proposed Key Personnel. A2114.  Via a letter bearing

---

[2] For example, the day after Task Order 6 was award to ECC, one ECC officer wrote to another:  "FYI – in our proposal we name Rene Garo as the SSHO.  I am not saying that we have to use him but if you hear his name mentioned, that is probably why." A2040.

that date, ECC requested permission to substitute "on an interim basis during execution of initial mobilization activities" the proposed Site Superintendent (Scot House) with Sureshkumar Parmeswaran and the proposed SSHO (Rene Garo) with Sajith G. Menon, and purported to inform USACE that Abdo Abagero (or James Fein if Mr. Abagero had visa-related delays) would be acting as Quality Control Systems Manager (in lieu of Mr. Al Chalabi).  A2114.

The next day, March 5, 2014, Mr. DeMattei sent an email to ECC denying the request for temporary substitutions, explaining that during the award process, "[m]ore weight was given to firms whose Key Personnel not only met required qualifications but whose experience exceed[ed] requirements[,]" and that temporary substitutions would be unfair to other bidders. A2131–2141; *see also* A2142–2144.

Eight days later, on March 13, 2014, ECC submitted a request for substitution (on a non-interim basis) to Mr. DeMattei. A2145. ECC proposed Rick Plemmons as the Project Manager (in lieu of Bruce Fox), Chris Benjamin as the Site Superintendent (in lieu of Scot House), Abdo Abagero as Quality Control Systems' Manager (in lieu of Mohmmad Al Chalabi), and Jibunoor Kanayo as SSHO (in lieu of Rene Garo).  A2145–2146.  In that letter, ECC also stated that "[w]e understand this TQ/DFAC award was a Best Value award with high emphasis placed on our management team," but "[d]ue to the 11+ month period from proposal submission to resolution of the protest, final award and NTP[,] our originally proposed Key Personnel were assigned to and continue to work other critical projects . . . ."  A2145

But this explanation is contradicted by record evidence.  The originally proposed project manager, Bruce Fox, worked on another project in Afghanistan awarded to another ECC entity from May 2013 to December 2013, A2662, and then, instead of working on Task Order 6 once the Notice to Proceed issued in early January 2014, worked on a different project for another

ECC entity in Afghanistan from at least February 2014 to April 2014. A2063, A2165.  Likewise, the proposed SSHO, Rene Garo, worked on another project awarded to another ECC entity in Afghanistan from May 2013 to December 2013, leaving him available to start working on Task Order 6 after the Notice to Proceed in early January 2014.  A2667.  In fact, the record evidence shows that ECC did not even ask some key personnel whether they would be willing to work on Task Order 6 until months after the notice to proceed. For example, ECC did not ask Scot House (the individual ECC originally proposed as Site Superintendent) to work on Task Order 6 until July or August of 2014.  *See* A3163 ("before my name was submitted they didn't ask me if I was willing to go to Bahrain"); A3163 (33:10–33:20), 3160 (30:3–13) (Mr. House testified he was first notified that he was going to Task Order 6 about three weeks into his leave, which occurred around July or August of 2014).

On March 20, 2014, ECC asked Mr. DeMattei if he would approve the personnel ECC proposed on March 13 as temporary replacements for the site surveys while Mr. DeMattei reached a permanent substitution decision.  A2161.

On April 1, 2014, Mr. DeMattei granted that request and approved the newly proposed personnel "[o]n a temporary basis for the TQ/DFAC site surveys only[,]" and informed ECC that he intended to issue a formal decision on whether those personnel could be permanent substitutes by the end of the following week. A2160.

On April 9, 2014, USACE approved Mr. Kanayo as the replacement SSHO and Mr. Benjamin as the replacement Site Superintendent but denied the request to substitute Mr. Abagero as the Quality Control Systems Manager because he did not have equivalent experience in that role to Mr. Al Chalabi.  A2168.  USACE also denied ECC's request to have Mr.

Plemmons substitute in as a part-time project manager because Mr. Plemmons was the project manager for the neighboring "P937" project in Bahrain.  *Id.*

Following Mr. DeMattei's decision on April 9, ECC reached out to Mr. Al Chalabi (the originally proposed Quality Control Systems Manager) *for the first time* on April 14, 2014 to inquire as to his availability and willingness to join the project: "Will you accept assignment as the QC Manager for the TQ and DFAC project in Bahrain?"  In fact, this email states plainly that ECC *never* told Mr. Al Chalabi about his role as Key Personnel on the task order before this email:  "Last year ECC proposed you as the QC Manager for the Transient Quarters and Dining Facility (TQ and DFAC) project in Bahrain. . . . I did not contact you earlier because I know your family is in San Antonio. I was not sure if you were interested in working in Bahrain." A2170–2171.

On April 16, 2014, ECC stated in a letter to Mr. DeMattei that the Bahraini immigration system was "off-line for the majority of March and had just recently become operational," and that it did not want to wait on a backlogged system for the visas for Messrs. Abagero (temporary replacement Quality Control Systems Manager) and Kayano (permanent replacement SSHO). A2172–2173.  Accordingly, ECC requested that Jim Fein be approved as an "interim" Quality Control Systems Manager and that Greg Hayes be approved as "interim" SSHO (to replace Mr. Abagero, the permanent replacement who USACE had just approved).  *Id.*  Then on May 20, 2014, ECC proposed to replace Jim Fein with Willie Toland as Quality Control Systems Manager because Mr. Fein was returning to the United States.  A2188.  ECC also informed USACE that the Bahraini Immigration Service had denied ECC's visa application for Mr. Kanayo, the replacement SSHO that USACE had approved, and that they expected Mr. Chalabi's

visa would be denied as well. A2188. Two days later, on May 22, 2014, USACE approved ECC's request to substitute Mr. Toland as the Quality Control Systems Manager. A2188.

On June 4, 2014, ECC requested to substitute Eli Njoh as Quality Control Systems Manager, and Mhanan Parakkadan as the SSHO due to Bahraini visa issues.  A2190. On June 20, 2014, USACE approved both substitutions.  A2198.

### C.  **The Alleged CMU Shortage (Count 2)**

On May 17, 2015, ECC's subcontractor, Kooheji Constructors, wrote ECC alleging that there was a shortage of aggregate (a component of Concrete Masonry Units).  A2276. On June 21, 2015, ECC responded to Kooheji, explaining that the documentary evidence Kooheji provided (a newspaper article) did not rise to the level of "proper documentation" necessary to support its claim of a shortage, and suggesting that Koohaji acquire "letters from approved suppliers stating why orders cannot be filled." A2277–A2280.  Although there were at least two approved aggregate suppliers, on July 22, 2015, Kooheji responded to ECC's request by providing a letter from only one supplier. A2280.

### D.  **Modification 16 (Count 3)**

On May 1, 2015, ECC submitted a proposal regarding the Gravity Feed to Sewage Lift Station (what would become the subject of Modification 16), in which it requested $478,394 in additional compensation but stated that "ECC is not seeking additional period of performance with this change." A2255.  On July 29, 2015, ECC submitted a revised proposal regarding the Gravity Feed to Sewage Lift Station, in which it requested $411,208.54 in additional compensation but again reiterated that "ECC is not seeking additional period of performance with this change." A2283.  On December 29, 2015, USACE issued Modification 16, which revised the Gravity Feed to Sewage Lift Station without changing the period of performance of the contract. A2338–2340.

### E.  ECC's Untimely Performance, Show Cause Letter, And Termination

Towards the end of 2015, it had become clear that ECC would not be able to meet its December 13, 2015 completion deadline.  ECC's November 18, 2015 invoice showed that 37 percent of the contract value had been earned. A2332 ("37 % earnings to date").  ECC's November 16, 2015 schedule projected a project completion date of August 31, 2016—more than 8 months past the required contract completion date. A2322.

On December 30, 2015—17 calendar days past the contract completion date—USACE issued a Show Cause letter because ECC had failed to complete the work within the requisite time set forth in the Contract.  A2341–2343.  The Show Cause letter notified ECC that to avoid default termination it must provide a response that included a new recovery plan and schedule that is both realistic and acceptable, providing the Contracting Officer with a true understanding of when ECC would complete the project.  *Id.*  The Show Cause letter also informed ECC that USACE would evaluate the recovery schedule provided in response in detail and would hold ECC accountable for all representations made in the recovery schedule and plan.  *Id.*

On January 9, 2016, ECC responded to USACE's Show Cause letter, asserting that "it is owed additional time for delays due to causes beyond ECC control," including mobilization delays, weather delays, Bahrain Government restriction delays, and security delays, along with delays for concrete delivery, material shortages, and reduced labor on-site due to material shortages. A2344. ECC's response also included a schedule dated January 10, 2016, which reflected a new project completion date of August 31, 2016—262 days after the completion date required by the Contract. A2351.

Some three months later, on March 4, 2016, ECC provided a schedule update, asserting that at "this time, the project is 56% complete." A2542.  Rather than the previous completion

date of August 31, 2016, ECC now stated that it planned to turn over the project to USACE on November 30, 2016—353 days after the completion deadline.  A2543.

On April 14, 2016, USACE issued Modification 20, which extended the overall contract period of performance by three days (to December 16, 2015) in light of USACE finding some merit to ECC's request for an equitable adjustment due to weather delays.  A2615.

On April 19, 2016—124 days past the December 16, 2015 completion date—USACE terminated ECC's contract for default.  A2617–27.  USACE found "ECC to be in default on the Contract for failure to meet construction progress schedules, to diligently prosecute the work, and to complete the work required under the subject contract by the required date."  A2619.

### F.   ECC Challenges Its Termination For Default, In Part, On The Basis Of Its Delay Claims, But The ASBCA Denies ECC's Appeal And The Federal Circuit Affirms

On June 23, 2016, ECC appealed the termination for default to the ASBCA.  *See* A2628–50.  In its Notice of Appeal and Complaint, ECC alleged that delays in awarding the contract and in resolving the bid protest resulted in "ripple" effects causing delays, including that the Key Personnel it originally proposed were re-assigned to other projects during the bid protest, that USACE allegedly delayed approving ECC's proposed substitutes, and that Bahrain's government suspended the normal processing of visas, all of which allegedly pushed construction into extreme weather and caused ECC to encounter shortages of concrete masonry unit materials.  A2635–2642.  In addition, ECC argued that the Contracting Officer had insufficient factual and legal support for termination, relied on irrelevant information to support the termination, and failed to comply with FAR requirements.  A2646–2647.

ECC conducted extensive pre-hearing discovery during which it deposed the Contracting Officer (Peter DeMattei), his scheduling analyst (Ramon Sundquist), a Section Chief within the USACE (Major Peter Han), and a contract specialist (Tino Philip).  Both ECC and USACE

submitted expert reports regarding the supposed delays and deposed each other's experts.

The parties also engaged in extensive pre-hearing briefing. Therein, ECC argued that the termination was wrongful, arbitrary, and capricious because: (A) the Contracting Officer failed to make the evaluation required by FAR 49.402-3(f)(4); (B) USACE failed to reconcile conflicting facts and information; (C) USACE relied on irrelevant financial information as the basis to terminate; (D) USACE's reliance on ECC's delays in attempting to complete the project by the completion date as the justification for the termination decision was not supported by the facts of the case or caselaw; and (E) USACE failed to reasonably review and act on ECC's requests for excusable delay. A2760–2783. ECC also argued that its expert found 147 days of excusable delay for the reasons covered in its ASBCA complaint, including 71 days of delay due to contract modifications 16, 17, and 18. A2763.

The ASBCA held a five-day hearing, from July 10, 2017 through July 14, 2017. After the hearing, the parties submitted extensive briefing. Therein, ECC again argued that the termination was wrongful, arbitrary, and capricious because: "USACE (1) failed to meaningfully consider the required FAR 49.402-3(f) factors; (2) failed to reconcile conflicting information regarding [ECC]'s actual progress and ability to complete; (3) relied upon irrelevant financial information;" and (4) "refused to quantify the excusable delay or consider it" even though USACE had previously issued modifications recognizing that some additional time was warranted and providing that additional time. A2860. Additionally, ECC argued that it "was entitled to time extensions, and liquidated damages were sufficient to protect the government for the remaining delay, if any." A2860.

The ASBCA denied ECC's challenge to the termination for default, concluding that "the contracting officer acted reasonably in terminating [ECC's] contract for failure to complete on

time." A2896. In reaching that conclusion, the ASBCA rejected the merits of all ECC's

arguments other than those seeking time-extensions, explicitly holding, among other things:

- "the government has met its burden of proving that ECC did not perform in a timely manner, A2881,
- "the contracting officer made the evaluation required by FAR 49.402-3(f)," A2888
- the "contracting officer reasonably considered the record before termination," A2891
- the "contracting officer did not rely on irrelevant financial information as the basis to terminate," A2894 (cleaned up),
- "there were substantial reasons to doubt that ECC would complete the project by" its proposed revised deadline, *id.*, and
- to the extent ECC raised a hot weather delay claim separate from the material shortage claim, ECC's claim failed on the merits: "we find that there is a failure of proof for any weather delays beyond those granted by the contracting officer." A2879; *see also* A2877–78 ("We find that the conclusions of ECC's expert were not persuasive in convincing us that there was significant weather delay that would entitle ECC to additional time.").

As for ECC's excusable delay arguments, the ASBCA held that it lacked jurisdiction

because ECC had not first presented a certified claim to the Contracting Officer for a decision as

required under *M. Maropakis Carpentry, Inc. v. United States*, 609 F.3d 1323 (Fed. Cir. 2010),

and *Securiforce International America, L.L.C. v. United States*, 879 F.3d 1354 (Fed. Cir. 2018).

A2885. The ASBCA explained that "a contractor contesting liquidated damages or a default

termination due to excusable delay must submit a claim for a time extension [to the contracting

officer] before appealing to the Board." *Id.* The ASBCA also declined ECC's request to stay the

proceeding so that it could present its delay claims to the Contracting Officer. A2888. The

ASBCA reasoned that not only was this request untimely, but it was also pointless because

ECC's alleged "time extension request" would only cover "a fraction of the time needed to

complete" the contract and therefore it was unlikely it "would have any effect on the outcome."

*Id.* (citing *Empire Energy Mgmt. Sys., Inc. v. Roche*, 362 F.3d 1343, 1351–52 (Fed. Cir. 2004)).

In other words, the ASBCA held that staying the case for ECC to belatedly present its delay

claims to the Contracting Officer was futile because ECC's own expert determined that the project was delayed 353 days but only some days of those delays were excusable, A2871.  Thus, even if ECC had suffered the excusable delays it alleged, the Contracting Officer would still be justified in terminating ECC for failing to complete the project on time.  And because ECC offered no persuasive challenge to the termination for default, the ASBCA concluded that "the contracting officer acted reasonably in terminating the contract for failure to complete on time," and denied the appeal.  A2896.

ECC appealed the ASBCA's decision to the Court of Appeals for the Federal Circuit, challenging in relevant part the ASBCA's finding that the Contracting Officer's termination decision was reasonable, and arguing that that the ASBCA "abused its discretion when it refused to stay ECC's appeal proceedings and [] foreclosed" ECC from presenting its claims to the Contracting Officer.  *ECC Centcom Constructors, LLC v. Sec'y of Army*, Case No. 19-1157 (Fed. Cir.), ECF No. 13 at 3.  The Federal Circuit affirmed the ASBCA decision on October 11, 2019. *ECC Centcom Constructors, LLC v. Sec'y of Army*, 779 F. App'x 750 (Fed. Cir. 2019).

### G.  A Second Bite At The Apple In The Court Of Federal Claims

On December 31, 2019—about two months after the Federal Circuit affirmed the board decision—ECC submitted a certified claim to USACE's Contracting Officer (2019 Claim), which sought to assert the same delays that ECC failed to request before it appealed the termination. A2897.  In a section titled "Contractor's Request For Relief," ECC explained that it "seeks a time extension of 273 days, withdrawal of all assessed liquidated damages, delay damages of $2,534,827.23, a conversion of the wrongful termination for default to one for convenience, and withdrawal and reevaluation of the CPARS rating."  A2906.

On April 8, 2021, ECC filed a complaint against the United States in the Court of Federal Claims challenging the same termination for default and offering the same excuses for its

inability to complete the project by the December 2015 deadline, ranging from the original bid protest, which allegedly caused it and its subcontractor to re-assign personnel to other projects, to USACE's alleged delays in responding to ECC's requests to substitute those re-assigned personnel, to material shortages, extreme weather, and the USACE's issuance of modifications. *See* Compl. (ECF No. 1).  The complaint demanded two forms of damages: (1) $2,534,827.23 in alleged delay damages, as requested in the 2019 Claim; and (2) $11,369,865.30 in alleged "breach damages," which ECC requested for the first time.  Compl. ¶ 75.

On September 10, 2021, we moved to dismiss the demand for $11 million in breach damages for lack of jurisdiction on the grounds that ECC failed to present it to the contracting officer (ECF No. 13) and we answered the remaining allegations in the complaint (ECF No. 14). On January 21, 2022, this Court dismissed ECC's new demand for $11 million in breach damages for lack of jurisdiction.  Even though both forms of damages relied on the same underlying operative facts, ECC sought relief under different theories but had not presented a certified claim for $11,369,865.30 under the breach damages theory for a final decision.  Order (ECF No. 26).  So, after that ruling, on February 7, 2022, ECC sent the Contracting Officer a new certified claim in an attempt to cure that jurisdictional defect (the 2022 Claim).  Am. Compl. (ECF No. 31) ¶ 3.  The 2022 Claim seeks all costs incurred by ECC on the contract, plus overhead, profit, and payments to its surety, *less* contract payments already received.  A2982. Following the Contracting Officer's denial of the 2022 Claim, on April 28, 2022, ECC filed an amended complaint in this Court.

Following the close of discovery, ECC filed its Second Amended Complaint, the currently operative complaint in this matter.  *See* SAC (ECF No. 58).  ECC's second amended complaint seeks declaratory relief, schedule relief, delay damages, and alleged breach damages:

| Count | Description | Delay Damages | "Breach" Damages [3] |
|-------|-------------|---------------|----------------------|
| **Count 1** | USACE allegedly violated its duty of good faith and fair dealing by not timely responding to ECC's personnel substitution requests. | 196 calendar days of delay and delay damages of $1,076,343.33. | $11,369,865.30 comprised of ECC's costs (plus overhead, profit, and surety payments) *less* payments received from USACE. |
| **Count 2** | ECC allegedly incurred additional delays due to concrete aggregate material shortages. | 65 calendar days of delay and delay damages of $671,597.69. | |
| **Count 3** | ECC allegedly incurred additional delays due to USACE's issuance of Modification 16 without providing ECC with additional time to complete the project. | 33 calendar days of time extension and $308,168.52 in delay damages. | |
| **Count 4** | ECC's CPARS rating is allegedly improper and must be withdrawn and re-evaluated. | N/A | N/A |
| **Count 5** | ECC's termination for default allegedly must be converted into a termination for convenience. | N/A | N/A |

*Id.* ¶¶ 13–99.

## ARGUMENT

The Court should grant summary judgment in favor of the United States.  First, ECC's termination and delay claims are barred by the doctrine of claim preclusion.  USACE terminated ECC for default because ECC failed to complete the TQ and DFAC task order in a timely manner.  ECC already challenged its termination for default (count 5) in the ASBCA on several grounds, including by attempting to raise the same excusable delays it seeks to raise in this case.  Indeed, before the ASBCA, ECC alleged delays stemming from USACE's responses to substitution requests (count 1), alleged delays stemming from an alleged CMU shortage (count 2), and additional time allegedly owed due to Modification 16 (count 3).  However, as the

---

[3] Although counts 1, 2 and 3 all contain the same demand for $11,369,865.30 in breach damages, it appears that the conduct constituting the "breach" of the covenant of good faith and fair dealing was the Government's alleged failure to timely respond to ECC's substitution requests—which is the substance of count 1.  *See* A2982; *see also* Argument Section IV.

ASBCA found in a decision affirmed by the Federal Circuit, the termination was reasonable, and ECC failed to properly present the delay claims to the Contracting Officer such that the ASBCA could not exercise jurisdiction over them.  Nevertheless, counts 1, 2, 3, and 5 present issues that were either raised in the prior litigation between the parties before the ASBCA or issues that should have been raised in the prior litigation.  Moreover, this suit arises from the same contract, and involves the same parties and operative facts as the prior appeal before the ASBCA. Accordingly, the doctrine of claim preclusion now bars ECC from getting a second bite at the apple in this Court on counts 1, 2, 3, and 5.

Second, even if these claims were not barred by claim preclusion, ECC's demand that the Court convert the default termination to a convenience termination (count 5) is barred by issue preclusion because ECC already litigated and lost that issue.  Third, even if neither *res judicata* doctrine applied, ECC's challenge to the termination for default is untimely under the CDA, which requires contractors to file suit in this Court within 12 months from receipt of a contracting officer's decision.  Fourth, because ECC's challenge to its termination for default (count 5) is barred by claim preclusion, issue preclusion, and is untimely under the CDA, ECC cannot seek the termination for convenience costs it is seeking under the guise of "breach" damages.

Fifth, even if neither *res judicata* doctrine applied and even if ECC could challenge the termination at this juncture, ECC's $11 million good faith and fair dealing claim would still be barred by the CDA's six-year statute of limitations because ECC failed to submit a certified claim within six years of that claim accruing.  Finally, ECC's challenge to its CPARS rating fails as a matter of law because ECC cannot show that USACE erred in issuing ECC's rating.

Given the absence of any genuine dispute as to the material facts, summary judgment should be granted in favor of the United States.

## I.   <u>Standard Of Review</u>

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  RCFC 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  A "genuine dispute" exists where a reasonable factfinder "could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248.  A "material fact" is that which might "significantly alter the outcome of the case; factual disputes which are not outcome-determinative will not preclude summary judgment."  *AT&T Adver., L.P. v. United States*, 147 Fed. Cl. 478, 482 (2020) (citing *Anderson,* 477 U.S. at 248).

As the Federal Circuit explains, "the burden is not on the movant to produce evidence showing the absence of a genuine issue of material fact . . . ."  *Sweats Fashions, Inc. v. Pannill Knitting* Co., Inc., 833 F.2d 1560, 1562 (Fed. Cir. 1987).  Rather, the burden on the moving party may be discharged "by showing the court that there is an absence of evidence to support the nonmoving party's case."  *Dairyland Power Coop. v. United States*, 16 F.3d 1197, 1202 (Fed. Cir. 1994) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).  "A nonmoving party's failure of proof concerning the existence of an element essential to its case on which the nonmoving party will bear the burden of proof at trial necessarily renders all other facts immaterial and entitles the moving party to summary judgment as a matter of law."  *Id.* (citing *Celotex*, 477 U.S. at 323).  Accordingly, if ECC fails to adduce evidence of one essential element of its claims, defendant is entitled to summary judgment.

## II.   <u>ECC's Challenge To Its Termination For Default (Count 5) And Its Delay Claims (Counts 1, 2, And 3) Are Barred Under The Doctrine Of Claim Preclusion</u>

The "doctrine of res judicata prevents a party from relitigating the same claims that were

or could have been raised before." *Case, Inc. v. United States*, 88 F.3d 1004, 1011 (Fed. Cir. 1996). The Supreme Court has "stressed that the doctrine of res judicata is not a mere matter of practice or procedure inherited from a more technical time than ours," but rather, it is "a rule of fundamental and substantial justice, of public policy and of private peace, which should be cordially regarded and enforced by the courts." *Federated Dep't Stores, Inc. v. Moitie*, 452 U.S. 394, 401 (1981) (cleaned up). "By affording a claimant only one opportunity to obtain redress, the doctrine conserves judicial resources, fosters reliance upon judicial decisions, and protects litigants from vexatious and needless litigation." *PCL Const. Servs., Inc. v. United States*, 84 Fed. Cl. 408, 415 (2008) (citing *Montana v. United States*, 440 U.S. 147, 153–54 (1979)).

Claim preclusion refers to "the effect of foreclosing any litigation of matters that never have been litigated, because of a determination that they should have been advanced in an earlier suit." *Phillips/May Corp. v. United States*, 524 F.3d 1264, 1267 (Fed. Cir. 2008). As the Supreme Court has explained, a final judgment on the merits "puts an end to the cause of action, which cannot again be brought into litigation between the parties upon any ground whatever," and "it is a finality as to the claim or demand in controversy not only as to every matter which was offered and received to sustain or defeat the claim or demand, *but as to any other admissible matter which might have been offered for that purpose*." *Nevada v. United States*, 463 U.S. 110, 129–30 (1983) (cleaned up) (emphasis added). As a result, claim preclusion applies when: "(1) the parties are identical or in privity; (2) the first suit proceeded to a final judgment on the merits; and (3) the second claim is based on the same set of transactional facts as the first." *Ammex, Inc. v. United States*, 334 F.3d 1052, 1055 (Fed. Cir. 2003).

The first claim preclusion prong is readily satisfied here. The "parties are identical or in privity," *id.*, because ECC was a party to the ASBCA litigation and is a party in this case, and the

respondent before the ASBCA, the USACE, is a component of the United States Government, the defendant in this case.

The second prong is also satisfied because the ASBCA proceeding resulted in a final judgment on the merits in which the ASBCA denied ECC's challenge to the termination for default. *See Phillips/May*, 524 F.3d at 1268 (claim preclusion "is properly applied to the final judgment of an administrative agency, such as a board of contract appeals") (internal quotation marks omitted). The ASBCA issued a judgment on the merits that "the contracting officer acted reasonably in terminating [ECC's] contract for failure to complete on time." A2896. The ASBCA's decision sustaining the termination for default was also affirmed by the Federal Circuit. *See ECC Centcom Constructors v. Sec'y of Army*, 779 F. App'x 750 (Fed. Cir. 2019)

And the third prong is also satisfied. This suit is "based on the same set of transactional facts," *Ammex*, 334 F.3d at 1055, as the ASBCA proceeding because both cases stem from the same contract (the MATOC), the same task order (Task Order 6), and the same course of events leading to the same termination for default. The Federal Circuit has made clear that "the general rule [is] that all claims arising out of the same contract constitute the same claim for purposes of res judicata," *Phillips/May*, 524 F.3d at 1273, such that "claims under a single contract generally must be brought together," *id.* at 1271. A contractor can only "overcome this presumption 'by showing that the claims are unrelated,'" *Avant Assessment, LLC v. United States*, 159 Fed. Cl. 632, 638 (2022) (quoting *Phillips/May*, 524 F.3d at 1272), which ECC cannot do here because its termination for failing to complete work on time is intrinsically related to its claims that its untimeliness was due to excusable delays or time extensions owed.[4]

---

[4] Indeed, ECC did not request any written discovery in this case on the grounds that the discovery before the ASBCA was sufficient for its case before this Court.

To be sure, the ASBCA held that ECC failed to advance its delay claims (counts 1, 2, and 3) when it challenged its termination for default because ECC failed to comply with the rule that "a contractor contesting . . . a default termination due to excusable delay must submit a claim for a time extension [to the contracting officer] *before* appealing to the Board."  A2885; *see also M. Maropakis Carpentry, Inc. v. United States*, 609 F.3d 1323, 1331 (Fed. Cir. 2010) (a "contractor seeking an adjustment of contract terms," whether "asserting the claim against the government as an affirmative claim or as a defense to a government action," requires presentment to the contracting officer prior to adjudication).  But the ASBCA did reach a decision on the merits: denying the challenge to the termination for default and concluding that "the contracting officer acted reasonably in terminating the contract for failure to complete on time."  A2896.[5]  And claim preclusion forecloses "litigation of matters that never have been litigated, because of a determination that they should have been advanced in an earlier suit."  *Phillips/May*, 524 F.3d at 1267.  In other words, claim preclusion provides "finality as to the claim or demand in controversy not only as to every matter which was offered and received to sustain or defeat the claim or demand, but as to any other admissible matter which might have been offered for that purpose."  *Nevada*, 463 U.S. at 129–30 (cleaned up) (emphasis added).

Here, ECC's excusable delay claims (1, 2, and 3) "should have been advanced" when ECC challenged its termination for default before the ASBCA—indeed, ECC attempted to do so.

---

[5] The ASBCA also declined ECC's request to stay the proceeding to present its delay claims to the contracting officer because not only was this request untimely, but it was also pointless since ECC's alleged "time extension request" would only cover "a fraction of the time needed to complete" the contract and therefore it was unlikely it "would have any effect on the outcome."  A2888 (citing *Empire Energy Management Systems, Inc. v. Roche*, 362 F.3d 1343, 1351–52 (Fed. Cir. 2004)).  In other words, even if ECC had taken the steps necessary to confer the ASBCA jurisdiction over the claims for time extensions, termination for default would still be justified because the number of days of excusable delay that ECC asserted did not equal (or exceed) the number of days that the project was delayed.  *Id.*

*See* Background I.F.  Specifically, because ECC was terminated for failing to complete its work on time, its assertions of excusable delay or time extensions allegedly owed constitute "any other admissible matter which might have been offered for [the] purpose" of challenging its termination for default.  *Nevada*, 463 U.S. at 129–30.  Moreover, ECC's extensive attempts (1) to raise its alleged excusable delays related to the substitution requests (claim 1) and the alleged CMU shortage (claim 2), and (2) to assert the time allegedly owed for Modification 16 (claim 3) as part of its challenge to the termination before the ASBCA reflects ECC's view that those matters "should have been advanced in an earlier suit," *Phillips/May*, 524 F.3d at 1267, when ECC was challenging its termination.  Accordingly, ECC "was obligated to prosecute [those] claims in the same proceeding," *id.*

This Court recently applied the doctrine of claim preclusion in similar circumstances in which a "jurisdictional defect before the ASBCA was solely due to [the contractor's] failure to submit all its claims to the contracting officer at one time," *Avant Assessment*, 159 Fed. Cl. at 639.  In that case, the Army terminated Avant's contract for default, which Avant successfully challenged at the ASBCA.  After the default termination was converted to a convenience termination, Avant submitted claims for termination costs to the contracting officer, which the contracting officer denied.  *Id.*  In appealing the denial of its termination costs claim to this Court, Avant sought additional relief, which it had not presented to the contracting officer in a certified claim.  *Id.*  As for the additional relief, "the ASBCA dismissed [many] of Avant's claims for lack of jurisdiction [for failing to present those claims to the contracting officer] but did enter judgment on the claims over which it had jurisdiction."  *Id.*  "Avant then submitted new claims to the contracting officer and [] appealed their denial to this Court."  *Id.*  Avant argued that the ASBCA's exercising jurisdiction over some of those claims "was not a final judgment on

the merits of the claims at issue in the Complaint" such that claim preclusion did not apply.  *Id.* at 638.

This Court rejected that argument and held that Avant was precluded from raising the claims that the ASBCA held it lacked jurisdiction to consider because "the applicability of claim preclusion does not depend on establishing that the prior action resulted in a final judgment as to identical issues or identical claims."  *Id.*  The Court explained that it was irrelevant that the ASBCA "did not enter judgment on the claims in this case" because it was sufficient that the "ASBCA reached a final judgment," and Avant could not overcome the presumption that "all claims arising out of the same contract constitute the same claim for purposes of res judicata." *Id.*  Because the ASBCA adjudicated the merits of some of Avant's appeals of a contracting officer's decision based on the same contract, "the final question for this Court is whether Avant could have and should have brought its current claims in the ASBCA litigation."  *Id.*  The Court in *Avant* held that although "a dismissal for lack of subject matter jurisdiction in the first action generally does not support claim preclusion in subsequent actions," it did in that case, where some issues in the appeal were decided on the merits and "the jurisdictional defect before the ASBCA was solely due to Avant's failure to submit all its claims to the contracting officer at one time."  *Id.* at 639.  That is, because "Avant was in full control of the ASBCA's jurisdiction," the Court held that Avant may not "proceed to piecemeal litigation of its claims through selectively creating or limiting ASBCA's or this Court's jurisdiction over its claims." *Id.*  Quoting *Phillips/May*, the Court concluded that Avant was "obligated to prosecute its claims in the same proceeding," and therefore, "Avant gets no second bite at the apple in this Court." *Id.*

The same reasoning applies here.  ECC appealed the Contracting Officer's termination for default decision to the ASBCA but did not first seek a contracting officer's decision for

excusable delays.  A2885.  And because "a contractor contesting liquidated damages or a default termination due to excusable delay must submit a claim for a time extension [to the contracting officer] before appealing to the Board," the ASBCA held that it "lack[ed] jurisdiction to consider the majority of these alleged delays."  *Id.*   Addressing ECC's remaining challenges to the Contracting Officer's decision to terminate ECC for default, the ASBCA entered a judgment on the merits, denying ECC's appeal and concluding that "the contracting officer acted reasonably in terminating the contract for failure to complete on time," A2896.

There can be no dispute that ECC "could have and should have brought its current claims in the ASBCA litigation," *Avant*, 159 Fed. Cl. at 638, as the ASBCA said it should have done. In fact, ECC attempted to do so.  *See*, *e.g.*, A2633-A2650; A2760–2784; A2798–2861.  Thus, the delay claims ECC now pursues in this case are fairly characterized as "any other admissible matter which might have been offered for [the] purpose" of challenging its termination for default.  *Nevada*, 463 U.S. at 129–30.  It is also beyond reasonable dispute that "the jurisdictional defect before the ASBCA was solely due to [ECC's] failure to submit all its claims to the contracting officer at one time."  *Avant*, 159 Fed. Cl. at 639.  Indeed, as the ASBCA explained, "a contractor contesting liquidated damages or a default termination due to excusable delay must submit a claim for a time extension [to the contracting officer] before appealing to the Board."  A2885; *see also M. Maropakis Carpentry*, 609 F.3d at 1331 ("The purpose" of the requirement to "make a valid claim to the contracting officer prior to litigating that claim" is "to encourage the resolution of disagreements at the contracting officer level thereby saving both parties the expense of litigation.").

Because ECC "was in full control of the ASBCA's jurisdiction" to hear its claims prior to appealing to the ASBCA, ECC should not be able to "proceed to piecemeal litigation of its

claims through selectively creating or limiting ASBCA's or this Court's jurisdiction over its claims." *Avant*, 159 Fed. Cl. at 639.  Rather, ECC was "obligated to prosecute its claims in the same proceeding," and therefore ECC should get "no second bite at the apple in this Court." *Id.*[6] Accordingly, as *Avant* makes clear, ECC's counts 1, 2, 3 (excusable delays/time extensions) and count 5 (termination for default) are precluded from being raised in this Court.

## III.    Issue Preclusion Bars ECC From Disputing The Propriety Of The Default Termination (Count 5) And The Underlying Factual Findings Made By The ABSCA

Even if claim preclusion did not apply, at a minimum, issue preclusion (also known as collateral estoppel) applies regarding the arguments that ECC raised and the ASBCA resolved concerning ECC's termination for default.  Collateral estoppel "means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." *Ashe v. Swenson*, 397 U.S. 436, 443 (1970).  The CDA itself reinforces issue preclusion by providing that factual determinations by the boards of contract appeals are final and conclusive unless disturbed upon judicial review.  41 U.S.C. § 7107(a) & (b).

Issue preclusion applies when: "(1) the issues are identical to those in a prior proceeding, (2) the issues were actually litigated, (3) the determination of the issues was necessary to the resulting judgment, and (4) the party defending against preclusion had a full and fair opportunity to litigate the issues." *Banner v. United States*, 238 F.3d 1348, 1354 (Fed. Cir. 2001).  Those elements are satisfied here.

First, the issues are identical.  As for whether the default termination was warranted given

---

[6] To the extent ECC argues in its response that it should have been allowed to stay the ASBCA proceeding to present its claims to the contracting officer—the ASBCA explicitly rejected that argument, and the Federal Circuit affirmed the ASBCA's decision notwithstanding that ECC pressed this argument on appeal.  *See* Background Section I.F, *supra*.

ECC's failure to perform in a timely manner, the board found that "the government has met its burden of proving that ECC did not perform in a timely manner," that there were "substantial reasons to doubt that ECC would complete the project by" its proposed revised deadline (which was still 353 days late), and that the Contracting Officer acted "reasonably in terminating the contract for failure to complete on time," A2881, A2894, A2896.  As for whether the Contracting Officer satisfied procedural requirements, the board found that "the contracting officer made the evaluation required by FAR 49.402-3(f)," A2888 (cleaned up), "reasonably considered the record before termination," and "did not rely on irrelevant financial information as the basis to terminate," *id.* at A2888, A2891, A2894 (cleaned up).

In addition, the board found that, even if ECC had properly submitted a claim seeking the time extensions and established its alleged entitlement to those time extensions as an affirmative defense to the termination, such relief would not have affected the outcome because, even with those extensions, ECC still would not have completed the project in a timely manner.  A2888 (citing *Empire Energy*, 362 F.3d at 1351–52).  Thus, the board denied ECC's motion to stay the proceeding to submit certified claims for delay because the termination would have been proper even if ECC were entitled to the time extensions it sought.  *Id.*

Second, these "issues were actually litigated" in that the parties presented their arguments concerning the default termination to the ASBCA in pre- and post-hearing briefing and argument during a five-day hearing, and the ASBCA reached a judgment on the merits of these arguments. *See* Background Section I.F, *supra*.

Third, these rulings were self-evidently necessary to the ASBCA's final decision to deny ECC's challenge to its termination for default.  A2881, A2894, A2896.  And the ASBCA decision remains valid after affirmance by the Federal Circuit.  *See ECC*, 779 F. App'x 750.

Fourth, both parties "had a full and fair opportunity to litigate these issues," *Banner*, 238 F.3d at 1354, because the ASBCA's findings are the product of extensive litigation—including document discovery, depositions, expert reports and rebuttal reports, pre-hearing briefs, five days of hearings, and post-hearing briefs.  *See* Background Section I.F, *supra*.

Issue preclusion thus applies, and this Court should not permit ECC to again challenge the termination for default (count 5) or challenge the ASBCA's findings, which have already been affirmed by the Federal Circuit.  Accordingly, because the default termination challenged in ECC's complaint before this Court (count 5) is the default termination challenged before, and finally decided by, the ASBCA, ECC's attempt to revisit the default termination in this suit is barred by issue preclusion.

## IV.   Even If Neither Res Judicata Doctrine Applied, ECC's Challenge To Its Termination For Default (Count 5) Would Still Be Barred By The One-Year Statute Of Limitations To Appeal A Contracting Officer's Final Decision

On top of claim and issue preclusion, ECC's count 5, in which it attempts to appeal the Contracting Officer's final decision terminating its contract for default, is time barred because ECC did not appeal that final decision to this Court within 12 months.  "A contractor may appeal a contracting officer's final decision either at the United States Court of Federal Claims within 12 months of issuance of the decision or at the appropriate board of contract appeals within 90 days." *Bowman Constr. Co. v. United States*, 154 Fed. Cl. 127, 137 (2021) (citing 41 U.S.C. § 7104(a), (b)(3)).

On April 19, 2016, the Contracting Officer issued his termination for default decision. A2617. In his decision, the Contracting Officer stated "[t]his is the final decision of the Contracting Officer" and informed ECC of its rights to appeal the termination to the ASBCA within 90 days or to this Court within 12 months.  A2626.  Accordingly, "[t]he statute of limitations began to run with the issuance of" the April 19, 2016 decision.  *Bowman*, 154 Fed.

Cl. at 137.[7]  And as a further result, ECC's ability to challenge the termination in this Court

expired on April 19, 2017.  *See* 41 U.S.C. § 7103(g) ("The contracting officer's decision on a

claim is final and conclusive and is not subject to review by any forum, tribunal, or Federal

Government agency, unless an appeal or action is timely commenced as authorized by this

chapter.").  Accordingly, the USACE's termination for default is final and unappealable, and it

was so on April 8, 2021, when ECC filed its initial complaint in this case.

## V.   ECC's $11 Million Good Faith And Fair Dealing Claim Seeks Termination For Convenience Costs, Which ECC Cannot Obtain Due To The Default Termination

As established above, ECC's challenge to its termination for default (count 5) is barred

by three independently sufficient legal principles:  claim preclusion (Section II, *supra*); issue

preclusion (Section III, *supra*); and the CDA's 12-month deadline to challenge contracting

officer final decisions in this Court (Section IV, *supra*).  "[O]nce a contract has been terminated

for default—a conclusion which stands in this case as a matter of law since Plaintiff failed to

timely [and successfully] challenge the termination—the contractor's ability to recover under the

contract is limited."  *Bowman*, 154 Fed. Cl. at 141.  Notably, convenience termination costs are

only available when the contract has been terminated for convenience.  *See Sharman Co. v.

United States*, 30 Fed. Cl. 231, 235 (1994) (dismissing plaintiff's claim for convenience

termination costs given previous determination sustaining default termination).

There are important reasons why this is so.  The parties' contract incorporates by reference

FAR 52.249-10 Default (Fixed-Price Construction), A166–167, which provides, in relevant part,

that "[t]he rights and remedies of the Government in this clause are in addition to any other rights

---

[7]  "Although a termination for default is deemed to be a government, rather than a
contractor, claim, the linchpin for the start of the statutory appeal period is a final decision by a
contracting officer terminating a contract for cause."  *Guardian Angels Med. Serv. Dogs, Inc. v.
United States*, 809 F.3d 1244, 1248 (Fed. Cir. 2016) (internal citations omitted).

and remedies provided by law or under this contract." FAR 52.249-10(d).  The Federal Acquisition

Regulation provides, in turn, that "[u]nder a termination for default, the Government is not liable

for the contractor's costs on undelivered work[.]"  FAR 49.402-2(a).  This means that, in a default

situation, the defaulting contractor's monetary recovery is expressly limited *only to payment for*

*work completed and accepted by the Government at the time of termination.  See Bowman,* 154

Fed. Cl. at 141-42 & n.7 (citations omitted).[8]  In this case, the work that ECC left undelivered was

the contract's sole object, *i.e.*, facilities that were complete by the contract's substantial completion

date.  That means that, because of its conclusive default, *none of ECC's costs* in unsuccessfully

attempting to provide a completed facility past that substantial completion date are recoverable.

Therefore, FAR 49.402-2(a) forecloses both any claim for "delay" damages, and its alternative

attempt to backdoor such costs into the case through a supposed application of the implied duty of

good faith and fair dealing.

     In this case, ECC is, in substance, seeking a recovery under the inapplicable termination

for convenience clause, rather than one under the governing termination for default clause.  In a

fixed-price construction contract, convenience termination costs generally comprise: "the total cost

basis" of the contract minus "the total of all progress and other payments" received.  48 C.F.R.

§ 49.206-2(b)(4); *see also* 2 Bruner & O'Connor Construction Law § 5:270 (July 2022 update)

("Upon the termination of the contract for the owner's convenience, the contractor shall be entitled

to receive payment for the work executed, and costs incurred by reason of such termination, along

---

     [8]    To the extent that some decisions of this Court have ruled otherwise based on considerations of equity, *see generally Kenney Orthopedic, LLC v. United States*, 88 Fed. Cl. 688 (2009)*, Roxco Ltd. v. United States,* 60 Fed. Cl. 39 (2004), those decisions do not purport to apply FAR requirements, do not explain why FAR requirements are not dispositive, and do not offer any logical rationale for suggesting that default-terminated contractors are entitled to monetary recoveries that are potentially far more generous than those received by contractors whose contracts are terminated for convenience.

with reasonable overhead and profit on the work not executed.").

ECC's supposed "breach" damages calculation follows this formula.  Reproduced here is a screenshot of the "breach" damages model that ECC produced pursuant to its discovery obligations:

| BREACH DAMAGES - TQ | | | | | |
|---|---|---|---|---|---|
| **USACE Invoices** | | | | | |
| Billed to date of Termination | | | $ | 26,143,947.42 | |
| | | | | | |
| Payments received from USACE | | | | | $ 23,326,039.86 |
| | | | | | |
| | | | | | |
| **ECCI CENTCOM** | | | | | |
| Actual Cost to Date (April 2016 | | | $ | 25,281,233.15 | |
| Fringe & OH | | | $ | 1,528,059.89 | |
| G&A | | | $ | 1,975,094.06 | |
| Profit  (3%) | | | $ | 863,531.61 | |
| | | | | | |
| Total | | | | | $ 29,647,918.71 |
| | | | | | |
| Payments to Surety | | | | | |
| Payment 1 (25 Jan-2021) | | | $ | 3,000,000.00 | |
| Payment 2 (9Feb-2021) | | | $ | 1,912,671.23 | |
| Total | | | | | 4,912,671.23 |
| | | | | | |
| | | | | | |
| **TOTAL DAMAGES** | | | | | $ 11,234,550.08 |

A3165.

This model reveals that ECC's $11 million damages calculation represents ECC's costs ($29 million in operating costs and markups, plus ECC's $4.9 million payment to its surety) *minus* the payments it has received ($23 million).  Not only do the "breach damages" claimed follow the convenience termination settlement formula, but they reflect zero effort to link any damage amount to the Government's alleged delays in responding to ECC's personnel substitution requests.  Accordingly, the $11 million reflects relief that would only be available if ECC's default termination were, in fact, converted to a convenience termination.

However, the ASBCA already rejected ECC's efforts to convert the default termination to a convenience termination and that decision was affirmed on appeal.  *See* Sections II & III, *supra*.  Given the conclusive "determination that the Government's default termination was factually and legally correct," ECC's demand for convenience termination costs cannot "logically succeed."  *Sharman Co.*, 30 Fed. Cl. at 235.  Moreover, the termination became final

and unappealable in April of 2017, well before ECC filed suit in this case.  *See* Section IV.

Consequently, because convenience termination costs are unrecoverable as a matter of law in this case, ECC's claim for $11 million fails as a matter of law.

**VI.  Even If Res Judicata Did Not Apply And Even If ECC Could Challenge The Termination At This Juncture, ECC's $11 Million Good Faith And Fair Dealing Claim Would Still Be Barred Because ECC Failed To Submit A Certified Claim Within Six Years Of That Claim Accruing**

A claim subject to the CDA, 41 U.S.C. § 7101 *et seq.*, will be barred if the contractor fails to submit that claim to the contracting officer within six years of the claim's accrual.  41 U.S.C. § 7103(a)(4) ("Each claim by a contractor against the Federal Government relating to a contract and each claim by the Federal Government against a contractor relating to a contract shall be submitted within 6 years after the accrual of the claim.").  To determine timeliness, then, requires examining when the claim was submitted to the contracting officer and when it accrued. Here, this analysis reveals that ECC's good faith and fair dealing claim accrued more than six years before ECC submitted it to the Contracting Officer, making it untimely.

**A.  ECC's $11 Million Good Faith And Fair Dealing Claim Was First Submitted To The Contracting Officer On February 7, 2022**

In an attempt to re-litigate its ASBCA loss in this Court, ECC submitted a certified claim to USACE on December 31, 2019.  A2897.  However, as we pointed out in our motion to dismiss (ECF No. 13), the 2019 Certified Claim did not assert any breach damages related to USACE's alleged breach of the duty of good faith and fair dealing, whereas the complaint sought $11,369,865.30 in "breach" damages.[9]  *See generally* Comp. (ECF No. 1).

This Court agreed, holding that ECC's demand for $11,369,865.30 in breach damages

---

[9] As explained above, the way ECC calculated its alleged "breach" damages reflects termination for convenience costs, which ECC cannot receive unless it first successfully challenges the termination for default (which it cannot).  [*See* Section V.]

seeks a remedy different than the one sought in the 2019 Claim.  *See* Order on Mot. to Dismiss (ECF No. 26) at 7 ("[T]he good faith and fair dealing claim in the Complaint requests remedies that differ from those sought in the certified claim letter[.]").  This Court observed the Federal Circuit's reasoning that courts "should treat requests as involving separate claims if they either *request different remedies* (whether monetary or non-monetary) or assert grounds that are materially different from each other factually or legally."  *Id.* (emphasis added) (quoting *K-Con Bldg. Sys., Inc. v. United States*, 778 F.3d 1000, 1005 (Fed. Cir. 2015)) (citing *Scott Timber Co. v. United States*, 333 F.3d 1358, 1365 (Fed. Cir. 2003) (two claims are the same if they "arise from the same operative facts, [and] claim essentially the same relief")).  Accordingly, this Court dismissed the portions of ECC's complaint requesting $11,369,865.30 in breach damages because the 2019 Claim was insufficient to confer jurisdiction.  *Id.* at 8.

In an attempt to remedy that defect, ECC submitted a supplemental certified claim on February 7, 2022 to USACE, in which it sought $11,369,865.30 in "breach" damages stemming from USACE's alleged breach of the duty of good faith and fair dealing.  A2982.  Notably, the substance of the 2022 Claim is the exact substance of Count 1 of the currently operative complaint:  both base the alleged "breach" of the implied duty on the Government's allegedly delayed responses to ECC's personnel substitution requests.  *Compare* [2022 Claim] at DOJSUPP-0000003 ("Pursuant to the terms of Task Order 0006 and the MATOC, and its duty of good faith and fair dealing, USACE had an obligation to reasonably review and timely approve the proposed interim key personnel that ECC—C proposed; USACE breached all of these obligations by failing to review and approve ECC-C-C's proposed interim personnel in a timely manner.") *with* SAC  ¶ 43 ("Pursuant to the terms of Task Order 0006 and the MATOC, and its duty of good faith and fair dealing, USACE had an obligation to reasonably review and timely

approve the proposed interim key personnel that ECC CENTCOM proposed; USACE breached all of these obligations by failing to review and approve ECC CENTOM's proposed interim personnel in a timely manner.").  Accordingly, although counts 1, 2 and 3 all contain the same demand for $11,369,865.30 in breach damages, the conduct constituting the "breach" of the covenant of good faith and fair dealing is the Government's alleged failure to timely respond to ECC's substitution requests—which is the substance of count 1.  Thus, February 7, 2022 is the date that ECC submitted its current good faith and fair dealing claim for $11,369,865.30.  *See, e.g.*, *Canpro Invs. Ltd. v. United States*, 130 Fed. Cl. 320, 350 (2017) (damages are an essential element of a breach of good faith claim).[10]

   As we demonstrate below, because the $11 million good faith and fair dealing claim accrued more than six years before ECC submitted it to USACE on February 7, 2022, that claim is time barred.

## B. ECC's $11 Million Good Faith And Fair Dealing Claim Accrued More Than Six Years Prior To ECC's February 7, 2022 Certified Claim

   "Whether and when a claim has accrued is determined according to the Federal Acquisition Regulation (FAR), the language of the contract, and the facts of the particular case." *Elec. Boat Corp. v. Sec'y of Navy*, 958 F.3d 1372, 1375 (Fed. Cir. 2020).  The FAR defines accrual of a claim as "the date when all events that fix the alleged liability of either the Government or the contractor and permit assertion of the claim, were known or should have been known."  48 C.F.R. § 33.201.  "For liability to be fixed, some injury must have occurred,"

---

[10] To the extent the 2019 Claim also contains a good faith and fair dealing claim, it is a separate claim because it did not seek the same relief.  *See, e.g.*, *K-Con Bldg. Sys.*, 778 F.3d at 1005 (courts "should treat requests as involving separate claims if they either *request different remedies* (whether monetary or non-monetary) or assert grounds that are materially different from each other factually or legally" (emphasis added)); *Scott Timber Co.*, 333 F.3d at 1365 (two claims are the same if they "arise from the same operative facts, [and] claim essentially the same relief").

however "monetary damages need not have been incurred." *Id.*; *see also Square One Armoring Servs. Co. v. United States*, 162 Fed. Cl. 429, 438-39 (2022) ("[A]ccrual occurs when a plaintiff has been put on notice that it will incur *some* injury, even if the full extent of its injury or damages only becomes clear later.").  ECC's $ 11 million good faith and fair dealing claim accrued more than six years before ECC submitted it on February 7, 2022 (*i.e.*, prior to February 7, 2016) for reasons evident in the claim, the complaint, and the record.

First, this claim is predicated on the USACE's allegedly delayed responses to ECC's Key Personnel substitution requests, which, as ECC alleges in both its complaint and certified claim, occurred between January 2014 and June 2014.  *See* SAC ¶¶ 24-42; A2982–86.  As explained above, the substance of the 2022 Claim is the exact substance of Count 1 of the currently operative complaint:  both base the alleged "breach" on the Government's allegedly delayed responses to ECC's personnel substitution requests.  *Compare* A2984 *with* SAC ¶ 43.  Accordingly, although counts 1, 2 and 3 all contain the same demand for $11,369,865.30 in "breach" damages, the claim and the complaint make clear that the conduct constituting the "breach" of the covenant of good faith and fair dealing is the Government's alleged failure to timely respond to ECC's substitution requests—which is the substance of count 1.   Thus, the events on which ECC relies and which "fix" the Government's alleged liability took place in the first half of 2014—more than 6 years before the $11 million good faith and fair dealing claim was submitted in 2022.

Second, ECC experienced at least "some injury" well before the limitations period began in 2016.  Indeed, ECC alleges as much.  For example, ECC alleges that "[a]s a direct result of USACE's failure to reasonably review and timely approve interim key personnel of ECC CENTCOM suffered a lack of progress from June 2014 through February 2015 resulting in at

least 117 days of additional delay to critical path activities."  SAC ¶ 48.  ECC also alleges that

"[a]s a direct result of USACE's failure to reasonably review and timely approve the proposed

interim key personnel that ECC CENTCOM proposed, the start of critical project activities,

including but not limited to site survey and geotechnical investigation, and associated design

work was delayed at least 59 days."  SAC ¶ 44.  ECC knew about those alleged delays by no

later than March 24, 2014, when it sent USACE a letter to assert these delays.[11]  ECC also

alleges that "[a]s a direct result of USACE's failure to reasonably review and timely approve the

proposed interim key personnel, and the associated delays, ECC CENTCOM's subcontractor

Kooheji was unable to timely mobilize its two planned piling crews," and by "the time Kooheji

was able to mobilize its piling crews after the above delays caused by USACE, Kooheji was only

able to mobilize one of its two planned piling crews, causing further critical path delays of 20

days, as Kooheji was forced to perform all of the piling work with one crew."   SAC ¶¶ 46–47.

ECC knew or should have known about these Kooheji-related delays on or before November 30,

2014, when Kooheji sent ECC a letter asserting these delays.[12]

Finally, a review of the contemporaneous records proves that ECC definitively knew it

was experiencing "some injuries" at the very latest by December 19, 2014, when it submitted a

"Request for Equitable Adjustment for personnel mobilization delays."  *See* A2230.  Therein,

---

[11] As of March 24, 2014, ECC revealed in a letter to USACE that it already believed that USACE taking an "unreasonable amount of time to approve" the substitutions had started delaying the design work: "[f]ield activities are being impacted, which in turn is delaying the Design development process," such that ECC "reserve[d] the right to an Equitable Adjustment . . . for resulting time and cost impacts."  A2157–58.

[12] On November 30, 2014, Kooheji explained that although the notice to proceed was in January, the "ECC teams arrived on May 5th 2014," which "cause[d] delay from 9th January 2014 to 5th May, 2014," and that although Kooheji completed the test piles in August of 2014, "in absence of clearance to proceed for actual works, the pilling sub-contractor has been forced to demobilize[] from the site."  A2200.  Kooheji "started the first pile" on October 11, 2014, which allegedly caused delay from August 13, 2014, through October 10, 2014, for a total of 59 days.

ECC set forth the dates of its substitution requests and USACE's responses throughout the first half of 2014, A2231–32, and then outlined in some detail the alleged impacts, A2232–34.  ECC stated: "This Request for Equitable Adjustment (REA) includes two components. 1) Impacts caused by untimely, and denied, Government approval of interim personnel for site access to initiate collection of design data and, 2) Impacts associated with the Bahraini Government's untimely visa processing, caused by late application submittal due to Government delay number one above."  A2230.  ECC also detailed some of these impacts:

- "Due to these Government driven delays and refusal to approve a proposed interim team, ECC CENTCOM Constructors has been denied the opportunity to 'Fast-Track' initial design activities, which has resulted in overall project critical path schedule impact."  A2232.

- "As our enclosed schedule analysis demonstrates, the 95% DP-I design package was significantly impacted due to the Government's delayed approval of ECC CENTCOM Constructor's repeated requests for interim supervisory personnel site access."  A2233.

- "The 95% DP-I design process was planned to start on 11 February, 2014.  ECC Letter H0002 dated 5 February requested approval for interim personnel in order to collect survey and geotechnical data necessary to start the DP-I foundation design. No Government response from H0002 was received by ECC CENTCOM Constructors, so a follow up letter (H0003) was sent on 25 February, which was responded to by the Government on 6 March.  This delayed start of the 95% DP-I design continued through 27 March due to the untimely Government action on our requested interim personnel requests."  *Id.*

- "Due to the Government's untimely, and denied personnel approval described above, ECC CENTCOM Constructors were unable to submit the proper VISA applications to the Bahraini Government as required. . . . This extended the VISA application process, and thus lengthened the critical impact to 24 August 2014."  *Id.*

Ultimately, in December of 2014, ECC concluded:  "As a result of these Government driven delays and associated schedule analysis provided, ECC CENTCOM Constructors requests an adjustment of 126 calendar days performance period and corresponding costs attributable to this delay of $113,812."  A2234.  The December 19, 2014 REA attached a cost breakdown reflecting "Kooehji Mobilization Delays" in that amount.  A2243. The REA thus demonstrates

that ECC knew about the "events that fix the alleged liability" and that at least "some injury" occurred by the date of the December 19, 2014 letter, more than 6 years before the 2022 Claim.

Accordingly, this Court should conclude that ECC's $11 million good faith and fair dealing claim accrued no later than December 19, 2014, more than six years before ECC submitted the its certified claim on February 7, 2022, and conclude that ECC's $11 million good faith and fair dealing claim is time-barred.[13]

**VII.**   <u>**ECC's Challenge To Its CPARS Ratings (Count 4) Fails As A Matter Of Law**</u>

ECC alleges that its "overall Unsatisfactory performance rating in CPARS" is arbitrary and capricious in light of two alleged procedural violations.[14]  SAC ¶¶ 87, 91.  The undisputed factual record demonstrates that no such violation occurred.

First, ECC alleges that the CPARS "was issued in violation of FAR 42.1503(d), as the final CPARS rating was never submitted to ECC CENTCOM for comment, nor was it submitted to the Contracting Officer's superior for resolution of any disputes between the parties."  SAC ¶ 90.  The first component of this claim appears to refer to the following requirement in FAR 42.1503(d): "Agency evaluations of contractor performance, including both negative and

---

[13] Although ECC may argue that the 2022 Claim is timely because the default termination occurred within the limitations period, the contemporaneous record and ECC's complaint reveal that the 2022 Claim arises from facts (the allegedly delayed responses to Key Personnel substitution requests) that took place between January 2014 and June 2014 and resulting injuries manifested and were known to ECC no later than December 22, 2014—not the default termination that took place nearly two years later.  *See* SAC ¶¶ 23–42.  In any case, such an argument would be self-defeating for ECC:  if the monetary claims were "related to the termination for default," then "the time for Plaintiff to have raised these issues was in a timely appeal of the termination for default decision," *Bowman*, 154 Fed. Cl. at 141.

[14] ECC's CPARS arguments are made under the umbrella of an "overall" unsatisfactory performance rating.  SAC ¶¶ 85–91.  However, there is no "overall" performance rating assigned in CPARS.  Instead, there are a number of categories to which individual ratings are assigned. A2788.  ECC's reference in its complaint to the unsatisfactory rating in CPARS, therefore, likely refer to USACE's final CPARS rating for the "Schedule" category, as USACE assigned different ratings for all other categories.  *See id.*

positive evaluations, prepared under this subpart shall be provided to the contractor as soon as practicable after completion of the evaluation.  The contractor will receive a CPARS–system generated notification when an evaluation is ready for comment."  48 C.F.R. § 42.1503(d).

Although ECC alleges that the CPARS rating "was never submitted" to ECC for comment, SAC ¶ 90, ECC's judicial admissions and the undisputed record contradict ECC's allegation.  In the hearing before the ASBCA, counsel for ECC admitted that ECC *did* receive the CPARS notifications, but "[t]he employee, or former employee at ECC [that] received the CPARS traffic for this project . . . was no longer employed by ECC when the contracting officer was sending the updates after termination."  A2796.  CPARS's user access records for this contract show that Jeff Leptrone was the contractor representative, A2787, and counsel for ECC before the ASBCA confirmed that Mr. Leptrone was the former employee ECC designated as recipient of CPARS traffic.  A2796.  The CPARS activity log shows that the evaluation was sent to ECC's contractor representative on April 27, 2016. A2787.  The log also shows that additional reminder emails were sent to ECC's contractor representative *six more times* over the sixty-day review period[15] in order to remind ECC's contractor representative to complete their review. A2785–2786.  On June 27, 2016, ECC's sixty-day review period in the CPARS system expired, and the evaluation was "[f]inalized and sent to the Reviewing Official" as the "Contractor Rep [was] non-responsive."  A2786.  Thus, ECC cannot dispute that the final CPARS rating was submitted to its officer and the reason ECC was unable to review the rating was that they failed to update their contractor representative information in CPARS.

---

[15]  While the review window provided in CPARS for the contractor representative is sixty days, A2682, 48 C.F.R. § 42.1503(d) affords the contractor "up to 14 calendar days from the date of notification of availability of the past performance evaluation to submit comments, rebutting statements, or additional information."

In view of these facts, the second component of this claim—that the CPARS was not "submitted to the Contracting Officer's superior for resolution of any disputes between the parties," SAC ¶ 90—also fails as a matter of law.  It is true that the FAR provides that "[a]gencies shall provide for review at a level above the contracting officer to consider disagreements between the parties regarding the evaluation," 48 C.F.R. § 42.1503(d), but that review is logically contingent upon there being "disagreements between the parties" for that agency officer "to consider" in the first place.  Here, the CPARS activity log shows that ECC *did not* complete review—the contractor representative was "non-responsive."  A2786.  The agency could not "provide for review of disagreements" between ECC and the agency at a level above the contracting officer when ECC did not make the agency aware that any disagreement existed.  Accordingly, this Court should reject ECC's attempt to transmogrify its failure to update its CPARS point of contact information into a claim against the Government.

Second, ECC alleges that the agency violated 48 C.F.R. § 42.1503(b)(4) when it allegedly "failed to consider any of the facts" it alleges in support of its delay claim (counts 1, 2, and 3) in assigning ECC an "Unsatisfactory" schedule rating.  SAC ¶ 89.[16]  That regulation requires, in relevant part, that "[t]he ratings and narratives must reflect the definitions in the tables 42–1 or 42–2 of this section."  48 C.F.R. § 42.1503(b)(4).  Those tables, in turn, define "Unsatisfactory" as "Performance does not meet most contractual requirements and recovery is not likely in a timely manner.  The contractual performance of the element or sub-element contains a serious problem(s) for which the contractor's corrective actions appear or were ineffective."  48 C.F.R. § 42.1503, Table 42-1—Evaluation Ratings Definitions.

---

[16] As explained above, although ECC does not allege as much in its complaint, the CPARS record reveals that ECC is challenging its "schedule" rating.  *See* fn. 14, *supra*.

Accordingly, for ECC's argument to be correct, this Court would have to determine that the Contracting Officer erred in determining that ECC's "[p]erformance does not meet most contractual requirements and recovery is not likely in a timely manner," *id.*  But to make that finding would require this Court to disregard the ASBCA's holdings that "the government has met its burden of proving that *ECC did not perform in a timely manner*," A2881 (emphasis added), and that "the contracting officer acted reasonably in terminating the contract for failure to complete on time," A2896.  For the reasons discussed in Section III above, issue preclusion and the CDA itself prevent such a factual finding.  *See Ashe*, 397 U.S. at 443 ("[W]hen an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit[.]"); 41 U.S.C. § 7107(a) & (b) (factual determinations by the boards of contract appeals are final and conclusive unless disturbed upon judicial review on appeal).

Moreover, at the time of termination, ECC was 124 days past the completion date set forth in the Contract, A2617, and, the month prior to termination, ECC provided a schedule update which stated at "this time, the project is 56% complete" and indicated that ECC planned to turnover the project to USACE on November 30, 2016.  A2542–2543.  Thus, ECC cannot raise a genuine dispute as to whether the Contracting Officer correctly applied the definitions set forth in Table 42-1, in concluding that ECC CENTCOM's performance with regard to Schedule was "Unsatisfactory."

## **CONCLUSION**

For these reasons, we respectfully request that the Court grant this motion and enter judgment for the United States.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. MCCARTHY
Director

s/ Eric P. Bruskin
ERIC P. BRUSKIN
Assistant Director

s/ Bret R. Vallacher by s/ A. Bondurant Eley
BRET R. VALLACHER
ERIC LAUFGRABEN
A. BONDURANT ELEY
BRITTNEY WELCH
Trial Attorneys
Commercial Litigation Branch
Civil Division
Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, D.C.  20044
Telephone: (202) 616-0465
Email: bret.r.vallacher@usdoj.gov

May 26, 2023                              *Attorneys for Defendant*

# **<u>APPENDIX</u>**

# INDEX TO APPENDIX

ASBCA Tab 11 Indefinite Delivery/Indefinite Quantity Multiple Award Task Order Contract (MATOC) Contract No. W912ER-11-D-0010 (June 16, 2011) .................................................1

ASBCA Tab 21 Government Letter, Request for Proposal, 35 MATOC MED 33 2012, Transient  Quarters and  Enlisted & Officer Dining Facility, Bahrain (PN #935 & 940) (November 29,  2012) .............................................................................304

ASBCA Tab 025 Amendment 0003 to Letter Request for Proposal (January 10, 2013) ...........361

ASBCA Tab 027 ECC Centcom Construction Letter, Letter RFP, 35 MATOC MED 33 2012, Transient Quarters and Enlisted & Officer Dining Facility, Bahrain (PN# 935 & 940) (February 19, 2013) .............................................................................363

ASBCA Tab 238 USACE to ECC Letter RE B24_Request for another Extension of Proposal Validity – ECC, TEQ & DFAC, Bahrain  (June 13, 2013) ...................................423

ASBCA Tab 057 E-mail from Leptrone to Philip, RE Request for Extension of Proposal Validity, 35 MATOC MED 33 2012, Transient Quarters and Enlisted & Officer Dining Facility, Bahrain (PN # 935 & 940) (UNCLASSIFIED (June 17, 2013) ..............................424

ASBCA Tab 028  Government Letter, Notification of Award: MATOC W912ER-11-D-0010, Task Order 0006 (September 11, 2013) ..........................................................426

ASBCA Tab 029 Contract W912ER-11-D-0010, Task Order 0006 (September 11, 2013) .......429

ASBCA Tab 245  Email from Stackow to Stephan, RE Notification of Award, ECC-E-238348 (September 12, 2013) ..........................................................2039

ASBCA Tab 246 Email from Wilson to Leptrone, RE Notification of Award, ECC-E-213236 (September 12, 2013) ..........................................................2046

ASBCA Tab 060  Government Letter, Subject - Suspension of Performance (September 24, 2013) ..........................................................................2049

ASBCA Tab 251  Email from Stephan to Stackow, RE Suspension of Performance, ECC-E-237822 (October 10, 2013) .................................................. 2050

ASBCA Tab 061  Government Serial Letter No. C-0003, Suspension of Performance Lifted (December 30, 2013) ..........................................................................2054

ASBCA Tab 062  Government Serial Letter No. C-0004, Notice to Proceed (January 2, 2014) ..........................................................................2055

ASBCA Tab 063 ECCI Serial Letter No. 4620.006.COR.H-0002 Key Personnel (2) (February 5, 2014) ..........................................................................2057

1

ASBCA Tab 1221 Contractors Serial Letter No. H-037 RFP-0031, MN011-Descope Remaining Punch List Items (February 20, 2014) ............................................................2063

ASBCA Tab 065  ECC Centcom Constructors Serial Letter No. 4620.006.COR.H-0003 Interim Personnel (February 25, 2014)..................................................................................2097

ASBCA Tab 067  ECC Centcom Constructors Serial Letter No. 4620.006.COR.H-0005 Interim Personnel (2) (March 4, 2014) ...............................................................................2114

ASBCA Tab 280  RE_ Request for Approval of Interim Personnel Bahrain TQ DFAC (March 5, 2014) ..................................................................................................................2131

ASBCA Tab 068 Government Serial Letter No. C-0005, Subject - Interim Personnel (March 6, 2014) ..................................................................................................................2142

ASBCA Tab 070 ECC Centcom Constructors Serial Letter No. 4620.006.COR.H-0006 (March 13, 2014) ...............................................................................................................2145

ASBCA Tab 073 ECC Centcom Constructors Serial Letter No. 4620.006.COR.H-0008 Delay Notification (March 24, 2014) ...................................................................................2157

ASBCA Tab 291 Email from Leptrone to DeMattei RE [EXTERNAL] RE_ ECC TQ_DFAC Key Personnel Substitution Request (UNCLASSIFIED) (April 1, 2014)...........................2160

ASBCA Tab 1222  Contractors Serial Letter No. H-038 Descope Remaining Punch List Items (April 5, 2014) ..................................................................................................................2164

ASBCA Tab 075  Government Serial Letter No. C-0007, Key Personnel Substitution (April 9, 2014) ..................................................................................................................2168

ASBCA Tab 296  Email from Toland to Al Chalabi RE M Al Chalabi - Assignment as QC Manager in Bahrain (April 14, 2014) ...............................................................................2170

ASBCA Tab 076 ECC Centcom Constructors Serial Letter No. 4620.006.COR.H-0011 TQ DFAC Interim US Team Staffing (April 16, 2014).......................................................2172

ASBCA Tab 326 Email from Leptrone to Paustovski RE [EXTERNAL] RE_ TQ_DFAC Personnel Request (May 22, 2014)......................................................................................2188

ASBCA Tab 079  ECC Centcom Constructors Serial Letter No. 4620.006.COR.H-014 (June 4, 2014).....................................................................................................................2190

ASBCA Tab 083 Government Serial Letter No. C-0009, Subject -  Key Personnel Substitution (June 20, 2014).....................................................................................................................2198

ASBCA Tab 435  Email from Kooheji Contractors to J. Sousa RE KC letter Ref# KCTQ-DFACLET-049 and Updated Schedule ECC-E-160327 (November 30, 2014)..................2199

ASBCA Tab 129  ECC Centcom Constructors Serial Letter No. 4620.006.COR.H-050 Request for EquiASBCA Table Adjustment for Personnel Mobilization Delays (December 19, 2014) ................................................................................................2230

ASBCA Tab 609  ECC Centcom Constructors  to USACE Letter RE RFP-0006 Revised Response: Revise Gravity Feed to Sewage Lift Stations  (May 1, 2015)...........................2255

ASBCA Tab 631 Kooheji Contractors Letter to ECC Centcom Constructors, LLC., Re: Shortage of Aggregate  ECC-E-000899 (May 17, 2015) ...........................................2276

ASBCA Tab 668  Email from Upton to Kooheji Contractors Re: Material Shortage Delay (June 22, 2015)...................................................................................................2277

ASBCA Tab 705  Kooheji Contractors Letter to ECC Centcom Contractors Re: Shortage of Aggregates and Related Concrete Products ECC-E-000903 (July 22, 2015) ................2280

ASBCA Tab 174  ECCI Serial Letter No. 4620.006.COR.H-084 Revised Lift Station Proposal  (July 29, 2015) ..............................................................................2283

ASBCA Tab 879  Weekly Project Update Report, ECC-E-000200 (November 16, 2015) ......2322

ASBCA Tab 227 Pay Estimate 14 (November 18, 2105) ........................................2332

ASBCA Tab 045 Modification No. 16 (December 29, 2015) ....................................2338

ASBCA Tab 197 Government Letter, Subject - Show Cause letter (December 30, 2015).......2341

ASBCA Tab 198  ECC Centcom Constructors Serial Letter No. 4620.006.COR.H-102, Subject – Show Cause Letter (January 9, 2016)....................................................2344

ASBCA Tab 205 ECC Centcom Constructors Serial Letter  No. 4620.006.COR.H-110, Subject - Project Schedule (March 4, 2016) .......................................................2541

ASBCA Tab 049 Modification No. 20 (April 14, 2016) ........................................2615

ASBCA Tab 002 Government Serial Letter No. C-0039, Subject -  Notice of Termination for Default  (April 19, 2016)..........................................................................2617

ASBCA Notice of Docketing of Appeal and Complaint (June 27, 2016) ..................2628

ASBCA Tab 1161 Appellant's Response to Government's Second Set of  Requests for Admissions of Facts (April 13, 2017).................................................................2651

ASBCA Gov't Reply Ex. 10, CPARs User Manual (April 2017) ............................................2678

ECC Centcom Constructors, LLC'S ASBCA Pre-Hearing Brief (July 6, 2017) ....................2760

ASBCA Gov't Reply Ex. 8, CPARS Activity Log
    (Last Accessed July 7, 2017) ........................................................................................2785

ASBCA Gov't Reply Ex. 9, CPARs User Access List
    (Last Accessed July 13, 2017) ......................................................................................2787

ASBCA Govt. Ex. 5 Final CPARS (July 13, 2017)........................................................................2788

Excerpt of July 14, 2017 ASBCA Hearing (July 14, 2017)........................................................2792

ECC Centcom Constructors, LLC's ASBCA Post-Hearing Brief (November 2, 2017) ..........2798

ASBCA Opinion by Administrative Judge O'Connell, ECC Centcom Constructors, LLC,
    Armed Services Board of Contract Appeals, Case No. 60647 (September 4, 2018) .........2863

ECC Centcom Constructors, LLC Request for Contracting Officer's Final Decision
    (December 31, 2019) ......................................................................................................2897

ECC Centcom Constructors, LLC Request for Contracting Officer's Final Decision
    for Breach of Implied Duty of Good Faith and Fair Dealing (February 7, 2022) ..............2982

Scott House 30 (B)(6) Deposition Excerpts (February 24, 2023) ............................................3158

PDF of "4620 006 Bahrain TQ_ Breach Calcs_Rev. 1.xls" ECC sent to Gov't counsel on
    February 20, 2023 ..........................................................................................................3165