**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| ECC CENTCOM CONSTRUCTORS, LLC, | ) ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 21-1169 |
| | ) | (Judge Tapp) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S PRETRIAL MEMORANDUM OF
CONTENTIONS OF FACT AND LAW**

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. MCCARTHY
Director

ERIC P. BRUSKIN
Assistant Director

OF COUNSEL:

REBECCA L. BOCKMANN
Deputy District Counsel
U.S. Army Corps of Engineers
Middle East District

A. BONDURANT ELEY
Senior Litigation Counsel
ERIC LAUFGRABEN
Senior Trial Counsel
BRITTNEY WELCH
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, D.C.  20044
Telephone: (202) 616-8254
Facsimile: (202) 305-2062
Email: Bondurant.Eley@usdoj.gov

June 26, 2023                    *Attorneys for Defendant*

## **TABLE OF CONTENTS**

**PAGE**

TABLE OF AUTHORITIES .................................................................................... ii

INTRODUCTION ................................................................................................1

CONTENTIONS OF FACT ..................................................................................3

    I.     Alleged Mobilization Delays ....................................................................3

    II.    ECC's Underlying Failure To Make Progress ...........................................8

    III.   Alleged Delays Associated With Test Piles ..............................................10

    IV.   Delays Associated With An Alleged Concrete Masonry Unit Shortage ..............12

    V.    Alleged Delays Associated With The Issuance Of Modification No. 16 ............13

    VI.   ECC's Termination For Default ...............................................................14

    VII.  ECC's CPARS Claims .........................................................................17

CONTENTIONS OF LAW ..................................................................................18

    I.     The USACE's Default Termination Was Proper ...................................18

    II.    As A Matter Of Law, Because Of Its Conclusive Default, ECC Is Not
          Entitled To Delay Damages, Or Its Actual Costs Incurred In Performance ........21

    III.   Even If ECC Could Overcome The Bar Of Its Conclusive Default, Its
          Delay And Damages Models Are Fatally Flawed And Do Not Support
          Recovery ..............................................................................................23

CONCLUSION ...................................................................................................25

## TABLE OF AUTHORITIES

**CASES**                                                                 **PAGE(S)**

*Blinderman Constr. Co. v. United States,*
    695 F.2d 552 (Fed. Cir. 1982) ........................................................................ 24

*Bowman Constr. Co. v. United States*,
    154 Fed. Cl. 127 (2021) ............................................................................ 22, 23

*Coath & Goss, Inc. v. United States*,
    101 Ct. Cl. 702 (1944) ................................................................................ 24

*Colonial Metals Co. v.United States*,
    494 F.2d 1355 (Ct. Cl. 1974) ...................................................................... 21

*DCX, Inc. v. Perry*,
    79 F.3d 132 (Fed. Cir. 1996) ...................................................................... 18

*Dep't of Transp. v. Eagle Peak Rock & Paving*,
    --- F.4th ---, 2023 WL 3829625 (Fed. Cir. 2023) .................................... 18, 19

*ECC Centcom Constructors, LLC v. Sec'y of Army*,
    779 F. App'x 750 (Fed. Cir. 2019) ................................................................ 1

*Hansen Bancorp, Inc. v. United States*,
    367 F.3d 1297 (Fed. Cir. 2004) .................................................................. 23

*Kenney Orthopedic, LLC v. United States*,
    88 Fed. Cl. 688 (2009) .............................................................................. 23

*Laka Tool & Stamping Co. v. United States*,
    650 F.2d 270 (Ct. Cl. 1981) ...................................................................... 22

*Lisbon Contractors, Inc. v. United States*,
    828 F.2d 759 (Fed. Cir. 1987) ............................................................ 18, 20, 22

*McDonnell Douglas Corp. v. United States*,
    567 F.3d 1340 (Fed. Cir. 2009) .............................................................. 18, 19

*P.R. Burke Corp. v. United States*,
    277 F.3d 1346 (Fed. Cir. 2002) .................................................................. 24

*Roxco Ltd. v. United States*,
    60 Fed. Cl. 39 (2004) ................................................................................ 23

*Torncello v. United States*,
    681 F.2d 756 (Ct. Cl. 1982) ......................................................................... 21

*William F. Klingensmith, Inc. v. United States*,
    731 F.2d 805 (Fed. Cir. 1984)..................................................................... 24

## STATUTES

41 U.S.C. § 7103(a)(4)(A) .............................................................................. 2

41 U.S.C. § 7104(b)(3) ............................................................................. 2, 19

## RULES

Fed. R Evid. 801 ....................................................................................... 11, 16

## REGULATIONS

48 C.F.R. § 42.1503 ..................................................................................... 17

48 C.F.R. § 49.201 ....................................................................................... 21

48 C.F.R. § 49.203 ....................................................................................... 21

48 C.F.R. § 49.401(a).................................................................................... 22

48 C.F.R. § 49.402-2..................................................................................... 22

48 C.F.R. § 49.402-2(a).............................................................................. 2, 23

48 C.F.R. § 52.249-10(a) .............................................................................. 18

## OTHER AUTHORITIES

2 Bruner & O'Connor Construction Law § 5:270 (July 2022 update) ........................................ 21

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| ECC CENTCOM CONSTRUCTORS, LLC, | ) ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **No. 21-1169** |
| | ) | **(Judge Tapp)** |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S PRETRIAL MEMORANDUM OF
<u>CONTENTIONS OF FACT AND LAW</u>**

Pursuant to paragraph 14(b) of Appendix A to the Rules of the United States Court of

Federal Claims (RCFC) and this Court's order of April 7, 2023 (ECF No. 57), defendant, the

United States, hereby respectfully submits its pretrial memorandum of contentions of fact and

law.

**<u>INTRODUCTION</u>**

Plaintiff ECC CENTCOM Constructors, LLC (ECC) is a contractor that was terminated

for default due to its failure to meet construction progress schedules, diligently prosecute the

work, and timely complete a construction project under a contract with the United States Army

Corps of Engineers (USACE).  ECC challenged its default termination before the Armed

Services Board of Contract Appeals (ASBCA), resulting in a decision sustaining the default that

was, in turn, affirmed by the United States Court of Appeals for the Federal Circuit.  *ECC

Centcom Constructors, LLC v. Sec'y of Army*, 779 F. App'x 750 (Fed. Cir. 2019).  Undeterred,

ECC then brought the instant action in the Court of Federal Claims to challenge its default

termination anew, as though the ASBCA and Federal Circuit decisions never existed, to seek

delay damages against the Government as though it had not been terminated for default, *and* to

recover all its actual costs incurred on the project, as though it had been terminated for convenience instead.  ECC also seeks to overturn its Contractor Performance Assessment Reporting System (CPARS) ratings associated with its default.

These claims are all legally infirm, and fatally so.  As set forth in the Government's pending motion for summary judgment, there is no issue on which to hold a trial in this case, because, as a matter of law:

(1)     ECC's challenge to its termination for default, and its related delay claims, are barred by both claim and issue preclusion, Def. Mot. for Summary J. at 18-27 (ECF No. 60);

(2)     ECC's challenge to its termination for default in this forum is untimely under 41 U.S.C. § 7104(b)(3), *id.* at 27-28;

(3)     Due to the legal operation of FAR 49.402-2(a) (Effect of termination for default), ECC can recover neither delay damages nor termination for convenience costs (which it has misleadingly labeled "breach damages" associated with a breach of the implied duty of good faith and fair dealing), *id.* at 28-31;

(4)     ECC's so-called "good faith and fair dealing" claim is untimely under 41 U.S.C. § 7103(a)(4)(A), *id.* at 31-37; and

(5)     ECC's challenge to its CPARS ratings fails because ECC cannot show that the rating issued by the USACE is erroneous.  *Id.* at 37-40.

As such, this case should be resolved on the papers, not through a second trial.

In submitting this Pretrial memorandum pursuant to this Court's scheduling order, ECF No. 46, and setting forth what the Government *would* prove if the Court were to hold a second trial, the Government specifically reserves, and does not waive, the legal arguments set forth in

its motion for summary judgment and urges the Court to resolve this matter on the papers, because there are no issues remaining for trial.  However, if this matter were to proceed to trial, the Government would again establish that ECC's default termination –and its resulting CPARS rating – were indeed warranted, and that ECC is not entitled to any of the costs or damages that it claims.  The evidence at trial will show that ECC's failure to make progress on the project resulted from ECC's own business decisions, management failures, and chronic failures to pay its main subcontractor, Kooheji Contractors W.L.L. (Kooheji), which significantly impacted the availability of project manpower and materials.  Thus, ECC has itself to blame for the circumstances resulting in its default termination.

In the end, the propriety of the default termination does not even present a close call.  As of the date of termination, ECC was 124 days past the contract completion date, and was only around 60 percent complete with the work.  Moreover, even according to ECC's own expert in this litigation, half of the delays that the project experienced are non-excusable, totaling *5.8 months* of systemic ECC delay that occurred out of approximately 27 months that ECC was on the project.  So, before the Court even considers the contested delay periods, as we will show, this is a magnitude of non-excused delay that would typically result in a termination for failure to perform.  Thus, even if ECC had not previously litigated this matter and lost, this case is still over before it starts, and the Government is entitled to judgment in its favor.

## **CONTENTIONS OF FACT**

I.   **Alleged Mobilization Delays**

On November 29, 2012, USACE issued a Request for Proposal (RFP) for Task Order 6 (Contract No. W912ER-11-D-0010-0006), seeking proposals for design and construction of the Transient Quarters (TQ) and Dining Facility (DFAC) in Manama, Bahrain.  DX5.

The RFP indicated the importance of a competent, experienced management team (Key Personnel) to carry out this international construction project, and identified the Projection Manager, Site Superintendent, Quality Control Systems Manager, and Site Safety Health and Environmental Officers as "Key Personnel." *Id.* at 7. Indeed, the RFP provided that, during the consideration of proposals, "[m]ore weight will be given for: Key Personnel with experience on at least three (3) projects of similar size, scope, and complexity" and for "Key Personnel with ten (10) or more years of relevant job experience that is related to the position they will hold on this project." *Id.*

ECC submitted its proposal in response to the RFP for Task Order 6, indicating that ECC's Key Personnel would be comprised of: Bruce Fox as Project Manager; Scott House as Site Superintendent; Mohammad Al Chalabi as Quality Control Systems Manager; and Rene Garo as Site Safety Health and Environmental Officer (SSH)). DX6 at 9-10. On the strength of this proposal, ECC was awarded the contract on September 11, 2013. DX7. Task Order 6 required ECC to commence performance within 20 days of receipt of the Notice to Proceed, and to complete all work within 710 calendar days of receipt of the Notice to Proceed. DX8 at 14.

ECC alleges that a subsequently filed bid protest pushed back its anticipated mobilization on Task Order 6 such that it had to re-assign Key Personnel. ECC alleges that these circumstances, in turn, caused rippling scheduling delays from which ECC was never able to recover, and that ultimately resulted in ECC's termination for default. The evidence at trial, however, will demonstrate that the short suspension of work associated with the bid protest did not cause the problems that compromised ECC's performance, and that, instead, ECC was the victim of its own poor planning.

First, undercutting the notion that the early suspension of work associated with the bid protest caused crippling delay, contemporaneous communications reveal that immediately after receiving the award—and before any bid protest was filed—ECC anticipated starting when it ultimately did — in January 2014.  DX199 at 2 ("We are likely looking at mobilizing in January time frame.")

Second, the evidence at trial will also show that the individuals identified in ECC's proposal as Key Personnel were not even available, or fully available, at the time of contract award, for reasons that had nothing to do with the bid protest.  For example, Mr. Fox was actually working on another ECC project at the time of contract award.  In fact, despite the RFP's requirement for a full-time project manager, ECC had not even included the costs of a full time project manager in its bid, instead having planned to share one project manager between the Task 6 project and another ECC project.  DX192 at 1 (ECC employees stating that "[w]e only bid the PM [Project Manager] about half time on the job" and that "[w]e stated [in our proposal that] Bruce Fox would be our PM but we did not promise a full time site presence or anything like that").  Likewise, the evidence at trial will show that Mr. House was not even asked about his availability to work on the project until March 2014.  And, on the day that ECC received notice of its award in September 2013, ECC personnel were already discussing replacing Mr. Al Chalabi writing that "[o]ur experience with [Mr. Al Chalabi] at the Air Force Academy indicates he may not be a good candidate for a lead position."  DX197.  As to Mr. Garo, the day after contract award, one ECC officer wrote to another:  "FYI – in our proposal we name Rene Garo as the SSHO.  I am not saying that we have to use him but if you hear his name mentioned, that is probably why."  DX199 at 2.

Accordingly, the evidence at trial will show that ECC was unprepared to begin performance with the Key Personnel team that it had identified, even at the time of award, and never  had a coherent plan as to how to staff the project from day one.  Moreover, the evidence at trial will show that, even though many of ECC's workers required visas, ECC did not timely pursue or obtain the required paperwork to enable them to enter Bahrain in the first place.

On January 2, 2014, after the bid protest was resolved in the Government's favor, USACE issued the Notice to Proceed.  DX15.  The evidence at trial will show that, during the initial months of the project, ECC suffered the consequences of its own poor planning, requiring restaffing efforts on a scale that led the ASBCA to observe, after this matter was tried, that "[t]he history of these proposals is so extensive that one virtually needs a scorecard to follow just the QC Manager replacements."  Exhibit A at 11.  The evidence at trial will confirm that these substitutions were, in fact, disruptive, and that the responsibility for these delays lay with ECC.

The project correspondence and records reflect that ECC had an unfounded expectation that it should be permitted simply to substitute any employees it had who were available at the time, regardless of whether these personnel were as qualified as those it had proposed, with USACE simply rubberstamping ECC's changes immediately.  ECC also believed – and continues to maintain – that the contract requirements for Key Personnel to be "at the site at all times during progress of the work" should not have applied to "initial mobilization activities" like topographic and utility surveys, geotechnical investigation including boring, fence installation, water flow testing, and test pile installation, and that it was "very unrealistic, punitive, and contrary to precedence to expect . . . key personnel . . . [to be] made available" for these activities.  DX59 at 2.

As we will show at trial, ECC's unilateral expectations, and the lack of planning that resulted from them, cannot be squared with the terms of the contract.  The underlying Indefinite Delivery/Indefinite Quantity Multiple Award Task Order Contract (MATOC) under which Task Order 6 was issued reflected an overall expectation that "[i]n connection with this contract, any in-house personnel, subcontractors, and outside associates or consultants *will be limited to individuals or firms that were specifically identified in the Contractor's accepted proposal*," DX4 at 251 (emphasis added).  The contract did permit substitutions, but required written authorization from the contracting officer, and the contracting officer was required to assess whether an employee that ECC proposed to substitute possessed "the level of qualifications and experience submitted in the accepted proposal or . . . required by the Solicitation." *Id.*

Thus, contrary to ECC's contentions that the USACE, and, in particular, contracting officer, Peter DeMattei, caused critical delay to the project, or treated ECC unfairly by unreasonably delaying and denying ECC's substitution requests, the evidence at trial will show that, (1) the USACE's average response time to a request for substitution was 11 days, well within the typical response time to a request for a contract variation on a construction project, and (2) when Mr. DeMattei denied substitution requests, he did so because the employee that ECC proposed to substitute lacked "the level of qualifications and experience submitted in the accepted proposal or . . . required by the Solicitation," in contravention of contract requirements. *Id.*

Moreover, to the extent that ECC suggests that Mr. DeMattei wrongly prevented it performing early critical site work (*e.g.*, site surveying, geotechnical investigation, and the "critical design work in Design Package 1," Pl. Pretrial Mem. at 3 (ECF No. 66)),the evidence at trial will show that Mr. DeMattei was simply fulfilling his obligations under the contract to

consider substitution requests, and refusing to let ECC commence work without a full complement of the necessary personnel.  Specifically, as was his job, Mr DeMattei required ECC to comply with the contract requirements that (1) the Project Manager, as a member of the Quality Control staff, "maintain a presence at the site at all times during progress of the work and have complete authority and responsibility to take any action necessary to ensure contract compliance[,]" DX8 at 251, (2) the Contractor Quality Control (CQC) Plan be "revise[d] to reflect [Quality Control staff] changes and submit the changes to the Contracting Officer for acceptance[,]" *id.* at 254, and (3) the CQC System Manager, the Site Superintendent, and the Site Safety and Health Officer to be on the site at *all* times.  *Id.* at 221, 248, 251.

The evidence at trial will also show that ECC's attempts to blame the USACE for delays in staffing that stemmed from the visa process for ECC's employees is similarly without merit. The contract specifically stated that "[e]ntry and exit visas, residence permits, and residence laws applicable to aliens" were the "*sole responsibility of the Contractor* to investigate, estimate as to cost, and assume the risk."  *Id.* at 51 (emphasis added).  Thus, the visa process for ECC's employees – and the associated risk of visa delays — was entirely ECC's responsibility. Accordingly, the evidence at trial will show that the mobilization delays about which ECC complains, and which purportedly excuse ECC's delinquencies, are of ECC's own making, as are the "ripple effects" that ECC maintains led to its eventual termination.  Indeed, the USACE fairly evaluated, and denied, ECC's request for an equitable adjustment, and contract extension on this basis.  DX103.

## II.   ECC's Underlying Failure To Make Progress

It will be a recurring theme in this case that ECC, in its briefing, through its witnesses, and through its scheduling expert, only tells part of the story.  However, ECC's selective story

telling cannot hide the elephant in the room –in all the periods when ECC supposedly experienced exclusively Government-caused delay, ECC itself faced enormous manpower and material shortages caused by its own chronic nonpayment of its major subcontractor, Kooheji (as well as, to some degree, ECC's designer, Michael Baker).  These facts, which ECC will attempt to continue sidestepping at trial, are fatal to ECC's assertions that the Government is solely to blame for ECC's problems such that the Court may disregard ECC's own delays and default.

As the evidence at trial will show, despite a contract requirement for ECC to self-perform at least 20 percent of the total amount of work on the actual project site, DX4 at 119, ECC self-performed none of the work, subcontracting with Kooheji to perform *all* of the construction of the project, and all of the procurement of materials.  DX167 at 7.  The evidence at trial will show that ECC had the same arrangement for a neighboring USACE project, and often treated the two projects as one large project.  We will demonstrate, not only that Kooheji's competing responsibilities for two large ECC projects strained, and at times overwhelmed, Kooheji's resources, DX837 at 12, but that ECC also developed severe cash flow problems, such that, at times, ECC had to use funds from one project to pay for the other project "to the point that [it] would cripple the performance" of the first project.  *Id.* at 13.

The evidence at trial will also show that ECC failed to pay Kooheji for months at a time, causing progress on the project to slow significantly.  Not only did ECC ultimately acknowledge as a "lesson learned" that it would "never [again] give two large contracts to one [subcontractor,]" *id.* at 12, but Kooheji informed ECC during the project that ECC's failure to pay what it owed Kooheji had a direct impact on the progress at the site and that because ECC had not paid Kooheji's invoices, Kooheji could not pay its own suppliers or subcontractors. DX178 at 155 and 158, DX559, DX849.  By December 2014, when ECC had failed to pay

Kooheji over $4M in invoices, Kooheji informed ECC "these delays in payments have seriously affected our project cash flow and we cannot continue to pay the materials/manpower suppliers and subcontractors any further[.]"  DX580.

Eventually, Kooheji's circumstances became so desperate that it brought the matter to USACE's attention.  With the knowledge that ECC was not paying its subcontractor and possibly breaching the contract by certifying in its payment requests that it had paid Kooheji, Mr. DeMattei demanded in February 2015 that ECC furnish proof that it had paid its subcontractors as certified in its pay requests.  DX66.  When it became clear that ECC had withheld payments from its subcontractors yet had certified that it paid those amounts in its pay requests, Mr. DeMattei issued a demand letter, requiring ECC to pay back the Government approximately $3 million in overpayments.  DX152.  ECC's inability to meet this demand, for both the Task Order 6 project and a similar demand on ECC's other USACE project, ultimately resulted in the takeover of the project by ECC's surety shortly before ECC's termination for default.

Given this background, we will demonstrate at trial that the approach taken by Rebecca Smith, ECC's scheduling expert in this case, is thoroughly incredible.  Ms. Smith goes to great lengths to try to justify a method for assessing supposedly "compensable" delay for ECC that *does not account for any of ECC's contributions to the delays that it experienced and does not investigate the reasons for the lack of progress on the project*.  The evidence at trial will prove, however, that the chronic, unresolved problems with Kooheji are the sole fault of ECC, and the major driver of the project delays for which ECC now seeks to blame the Government.

## III.   <u>Alleged Delays Associated With Test Piles</u>

From the premise that it experienced mobilization delays that were USACE's fault, ECC alleges that it was pushed into a period where Kooheji could only mobilize one piling crew, as

opposed to two, resulting in delays for which the Government is supposedly responsible.  *See* Pl.
Pretrial Mem. At 7-8 (mentioning "staffing shortages from the piling subcontractor").  Here
again, ECC will be unable to demonstrate at trial that its difficulties in completing the test pile
work in this period are attributable uniquely to Government causes.

First, the evidence at trial will show that ECC, *not* USACE, bore the responsibility of
staffing the project, and ensuring that appropriate subcontractor manpower was present to
prosecute the work at all times during performance.  In advancing many of its claims in this case,
to include claims for the test pile delays and aggregate shortages (which we will discuss below),
ECC seeks to turn that principle on its head, by suggesting that having its activities "pushed" into
a later period than planned magically absolved ECC of its pre-existing staffing responsibilities.
As noted above, the evidence at trial will not support ECC's theory of such a "push" associated
with ECC's mobilization in the first place and will instead establish that ECC's difficulties in
completing work related to the test piles were of ECC's own making.

As it is, ECC will have great difficulty establishing that Kooheji ever intended to assign
two piling crews to this project at all.  ECC's "proof" appears to consist overwhelmingly of self-
serving testimony by ECC employees recounting purported out of court statements by
unidentified Kooheji personnel, which are obviously inadmissible hearsay.  *See* Fed. R Evid.
801, 802.  On the other hand, the Government will present objective evidence –in the form of a
realized productivity analysis – establishing that crew size alone cannot account for the extended
durations eventually required for the test pile activity.  DX179 at 24.

Moreover, the evidence at trial will demonstrate that other problems that were ECC's and
Kooheji's responsibility affected their progress during the test pile period, amounting to
concurrent delay for which the Government is not responsible.  For example, when Kooheji's

piling subcontractor first mobilized in July 2014, the required reinforcing steel for the piles was not on site and, once it arrived and was inspected, it was determined that the material varied from previously submitted shop drawings, causing delay as Kooheji was forced to re-work the shop drawings.  DX488.  ECC's claims in this case do not appear to have considered Kooheji quality delays as a possible contributor to the alleged effects on piling subcontractor mobilization, despite record evidence to the contrary.

Indeed, as another example, key correspondence reflects that Kooheji had to wait for the ECC team to arrive in Bahrain, for ECC to staff the project with a Quality Control Civil Engineer, for ECC to provide piling design information, for ECC to transmit final AutoCAD drawings, and then for ECC to remobilize the subcontracted piling crew once submittals were approved.  DX1253 at 112-15.  This is not a record that supports ECC's claim that Government-caused delay was solely to blame for the overall delays associated with the project's test piles.

## IV.    Delays Associated With An Alleged Concrete Masonry Unit Shortage

ECC next alleges that the mobilization and test pile delays pushed its performance into a period where there was a shortage of aggregate necessary to make quality concrete masonry units (CMUs) for the walls of the project's buildings, resulting in additional project delays.  Pl. Pretrial Mem. at 8-9, ECF No. 66).  Again, however, this issue must be evaluated in a context where there is no evidence of such a "push," against the background of ECC's continued problems with Kooheji, and ECC's obligations to supply the materials that were needed for contract performance.

As the Government's expert will establish, any masonry installation delay appears to be due, not to a shortage of aggregate (because it appears that there was an alternate supplier of material that went untapped), but rather due to a lack of sufficient manpower by ECC, continued

deficient work, and slow work-progress, realities that are writ large in project correspondence between ECC and Kooheji.  *E.g.*, DX142 ("[F]or more than 3 months we have been laying CMU on the ground floor of the TQ.  So we are over 100 days.  And will still be working on the ground floor through most of June.  I hope this is a clear picture of why you [Kooheji] need more man power."); DX144 ("KC [Kooheji] cannot afford to use the masons to place your concrete [as opposed to laying CMU block]"); DX145 at 4 ("We really need more CMU workers, Steel Fixers, Plumbers and electrician[s].  There are a lot of areas already open and some of them not even started yet because of the lack of manpower.  In Area A ground floor alone the work is too slow and production very little.  Area A First Floor CMU installation must continue and complete not more than two weeks because this is now under critical longest path").  As such, ECC will not be able to establish Government causes as a sole cause of its difficulties during this period, or for any other period when the contract completion date in ECC's schedules slipped.

## V.      Alleged Delays Associated With The Issuance Of Modification No. 16

ECC next complains of alleged delays in the USACE's handling of a change order for the project's sanitary sewer system.  ECC relates that, "[e]arly in the design process, a differing site condition was discovered that required a change to the design of the sanitary sewer system[,]" and that it took "months and months," to December 2015, for Mr. DeMattei to issue a corresponding contract modification, which then imposed a price below ECC's cost estimate for the work, and "unfairly" did not include a time extension.  Pl. Pretrial Mem. at 9 (ECF No. 66).

The evidence at trial will demonstrate that this circumstance was not a source of project delay, "unfair[ness,]" or damages to which ECC is entitled, because ECC did no Modification 16 work and did not delay any other work while waiting for Modification 16.  Because ECC never did any Modification 16 work, it is unclear why this issue is even in the case.

13

**VI.**   **ECC's Termination For Default**

Ultimately, ECC fell so far behind schedule that USACE terminated it for default.  The evidence at trial will show that this decision followed all FAR procedural requirements, was made in good faith, was warranted, and was well-founded, given ECC's extreme performance delays and self-inflicted wounds.  Indeed, had it been otherwise, the default termination would not have been sustained by the ASBCA, and then affirmed by the Federal Circuit.

On April 23, 2015, USACE issued a letter of concern regarding ECC's failure to make progress toward completion of the Contract, and demanded a recovery plan.  DX77.  The letter was occasioned by the fact that the most recent schedule submitted by ECC showed that no progress had been made to recover delays ECC had already incurred, and instead indicated that the project completion date had slipped to July 7, 2016.  *Id.* at 1.  This was far beyond the contract completion date of December 16, 2015.  DX10.

In response to the April 23 letter, ECC submitted a recovery schedule that indicated a completion date of April 17, 2016.  DX80 at 18, 24.  However, this schedule was grossly unrealistic, because meeting the projected April 17, 2016 completion date required manpower between the months of June 2015 and November 2015 of between 390 workmen (for June 2015) to 780 workmen (for November 2015), whereas the actual work force on site for these months was only approximately 250 to 400 workers, half of what would be required.  *See id.* at 25.

On December 30, 2015, seventeen days after ECC was required to have completed work under the contract, the Government issued a Show Cause letter.  DX105.  The Show Cause letter informed ECC that the project was past the contract completion date, and notified ECC of its numerous failures to comply with its contractual obligations, including:

- ECC's continued failure to recover the project schedule to complete within the required contract completion date;

14

- The fact that, for the year prior to issuance of the Show Cause letter, ECC had only progressed the project one to three percent per month, which was insufficient and inadequate to effect completion on a timely basis; and

- ECC November 16, 2015 schedule projected a project completion date of August 31, 2016, more than eight months past the contract completion date.

*Id.* at 2.  The Government instructed ECC to provide an updated recovery schedule.  *Id.* at 3.

ECC ultimately submitted a second recovery schedule that indicated a project completion date of November 30, 2016 —353 days past the required Contract Completion Date.  DX112 at 5, DX1126 at 1.  The Government's scheduler, Ramon Sundquist, analyzed this submission, and, as the ASBCA found, gave it "a mixed review."  Exhibit A at 31.  Although Mr. Sundquist found the recovery schedule to be  "a reasonably solid schedule," in that it was more realistic than ECC's past submissions, he also stated: "*Though I don't recommend that the schedule be 'approved',* I could recommend that it be accepted for use and monitoring purposes for upcoming progress."  DX1126 at 2.

On April 19, 2016, USACE terminated ECC for default.  DX1.  The evidence at trial will prove that in making his decision to terminate, Mr. DeMattei appropriately considered FAR clauses 52.249-10 Default (Fixed-Price Construction) and 52.211-10, Commencement, Prosecution and Completion of Work (APR 1984), and found that ECC's failed to meet construction progress schedules, to diligently prosecute the work, and to complete the work required under the contract by the required date.  *See generally* DX1, DX175.  Indeed, the default termination was not ultimately a close call, because, as of the date of the notice of default, ECC was 124 days past the contract completion date, and "as of Progress Payment Request No. 17 . . . the project is far from completion, only 56 percent complete."  DX1 at 6.

Although the Government will walk through all the various aspects of Mr. DeMattei's termination decision at trial, and highlight the record that supports them, the bottom line is that Mr. DeMattei appropriately considered the reality of ECC's existing delinquency, and, in considering Mr. Sundquist's analysis when deciding whether to accept ECC's recovery schedule, reasonably, and without animus, took into account the fact that "ECC has never submitted a schedule to which it has adhered." DX1 at 7. Mr. DeMattei also determined that ECC's final recovery schedule was simply "not acceptable where it indicates an end of project date of 30 November 2016 (350 days after the completion date required by the Contract)[,]" and "not acceptable considering the importance of this project to the U.S. Navy's mission at NSA Bahrain and the likelihood that allowing ECC to continue performance would result in further slippage of any subsequently accepted schedule." *Id.* Mr. DeMattei concluded that "ECC's own actions and its admission of the inability to pay its debts as they become due leave the Government with little to no confidence that ECC is capable of adhering to its own revised schedule where adherence to the schedule is strictly contingent upon funding the workforce necessary to complete the proposed schedule." *Id.* at 8. The evidence at trial will show, therefore, not only that Mr. DeMattei himself believed that there was no reasonable likelihood that ECC could perform the entire contract effort by December 16, 2015, but that that belief was objectively reasonable.

We will also demonstrate that Mr. DeMattei considered ECC's excuses for its failure to meet construction progress schedules and to complete the work by the contract completion date. *Id.* at 8-9. Mr. DeMattei had previously conducted an analysis of ECC's claims that "it is owed additional time for delays due to causes beyond ECC control," including mobilization delays, weather days, Bahrain Government restriction delays, security delays that included concrete delivery, material shortages, and reduced labor onsite due to material shortages, and reasonably

found them to be without merit.  *See, e.g.*, DX103, DX175, DX1052, DX1157, DX1158, DX1169, DX1170.  Thus, even if the Court were to disregard the ASBCA's determination, affirmed by the Federal Circuit, that the default was proper, the trial evidence will again show that the default termination was proper.

## VII.   ECC's CPARS Claims

Finally, ECC complains at length about Mr. DeMattei's handling of its CPARS rating, disputing USACE's conclusion that ECC's performance was Unsatisfactory in the category of Scheduling, and contending, in the main, that USACE failed to provide ECC with notice and an opportunity to dispute USACE's comments.  Pl. Pretrial Mem. at 10-11.  ECC will be unable to demonstrate any viable CPARS-related claim at trial.

First and foremost, the trial evidence will establish that ECC's performance was *actually unsatisfactory* with respect to scheduling.  The Federal Acquisition Regulation (FAR) provides that an "Unsatisfactory" rating attaches where a contractor's "[p]erformance does not meet most contractual requirements and recovery is not likely in a timely manner. The contractual performance of the element or sub-element contains a serious problem(s) for which the contractor's corrective actions appear or were ineffective."  48 C.F.R. § 42.1503, Table 42-1—Evaluation Ratings Definitions.  It is obvious that, at the time of its termination, ECC was 124 days past the completion date set forth in the contract, had completed only 56 percent of the project, and indicated that, at best, it planned to turn over the project to USACE on November 30, 2016, 353 days late, which was obviously unacceptable.  *See* DX1, DX175.

Second, we will establish that USACE *did* provide ECC with both notice *and* an opportunity to comment on its final rating  USACE sent the draft rating, and multiple reminders about it, to ECC's designated point of contact.  *See* DX265.  However, ECC did not ultimately

17

comment on the draft rating because ECC's designated point of contact had left the company and ECC had not updated its contractor representative information in CPARS.  Thus, like every other aspect of this project, ECC has only itself to blame for the CPARS circumstance about which it now complains.

## CONTENTIONS OF LAW

### I.     The USACE's Default Termination Was Proper

FAR 52.249-10 Default (Fixed-Price Construction) provides, in relevant part, that, "[i]f [a] Contractor refuses or fails to prosecute the work or any separable part, with the diligence that will insure its completion within the time specified in this contract including any extension, or fails to complete the work within this time, the Government may, by written notice to the Contractor, terminate the right to proceed with the work[.]"  48 C.F.R. § 52.249-10(a).  As the Federal Circuit has recently explained, "[w]hen a contracting officer terminates a contract for default, and the contractor appeals that termination decision, 'the [G]overnment . . . bear[s] the burden of proof with respect to the issue of whether termination for default was justified."  *Dep't of Transp. v. Eagle Peak Rock & Paving*, --- F.4th ---, 2023 WL 3829625, at *4 (Fed. Cir. 2023) (quoting *Lisbon Contractors, Inc. v. United States*, 828 F.2d 759, 765 (Fed. Cir. 1987)).  This means that, "[i]n failure-to-make-progress cases, the [G]overnment must establish that the contracting officer's decision to terminate . . . was [objectively] reasonable given the events that occurred before the termination decision was made." *Id.* (citations and quotations omitted).   "If the government makes this showing, the contractor then bears the 'burden of proving that its nonperformance was excusable.'"  *Id.* (quoting *DCX, Inc. v. Perry*, 79 F.3d 132, 134 (Fed. Cir. 1996) and citing *McDonnell Douglas Corp. v. United States*, 567 F.3d 1340, 1353 (Fed. Cir. 2009) for the proposition that the "burden shifts to contractor to rebut government's untimeliness

showing or to establish 'that there was excusable delay'").

"On the often-central issue of whether it was reasonable to view timely completion as not reasonably likely, the tribunal must focus on tangible, direct evidence reflecting the impairment of timely completion." *Id.* (citations and quotations omitted). This exercise entails, among other things, deciding the actual performance that the contract requires and the amount of time remaining for performance, comparing the percentage of work completed and the amount of time remaining under the contract, evaluating the contractor's failure to meet progress milestones, problems with subcontractors and suppliers, the contractor's financial situation, as well as a contractor's performance history, and "other pertinent circumstances." *Id.* (citations and quotations omitted). "This is a de novo adjudication: If the adjudicatory tribunal finds, based on all the evidence before it, that the standard for termination under the contract's default clause is met, it is to uphold that decision whether or not the contracting officer stated the basis for that finding." *Id.*

For the reasons set forth in the Government's motion for summary judgment, and its motions *in limine* in this case, the Court should not entertain ECC's challenge to its default termination during the upcoming trial of this matter, because ECC's default termination has already been conclusively upheld by the ASBCA and the Federal Circuit, and because ECC's challenge in this forum is untimely under 41 U.S.C. § 7104(b)(3). However, if this Court still elects to permit ECC to proceed to trial (which it should not), there is no question that the default termination was proper. Again, at the time of its termination, ECC was 124 days past the completion date set forth in the contract, only 56 percent complete, and projecting a completion date of November 30, 2016, 353 days late. DX1 at 6. ECC had never submitted a schedule to which it had adhered, and was experiencing widespread problems with subcontractors and

suppliers, which it had not been paying appropriately.  It was objectively reasonable for the

contracting officer to have concluded that there was "no reasonable likelihood that the [ECC]

could perform the entire contract effort within the time remaining for contract performance."

*Lisbon*, 828 F.2d at 765.

Moreover, ECC will be unable to show that its nonperformance was excused (let alone

that it is entitled to any compensable damages) for its delays on the project.  The evidence at trial

will show that, in all the periods that ECC's expert has claimed constitute periods of delay for

which the Government was responsible, ECC was suffering the effects of its own management

failures and cash flow problems.  Notwithstanding the early suspension of work associated with

the bid protest (which ECC blames for literally all its "cascading" or "rippling" delay on the

project), ECC was not ready, willing, and able, at the time of award, to staff the project with the

contractually required full complement of Key Personnel.  As a result of a lack of planning and

timely attention to the visa requirements of its personnel, ECC delayed the project as it struggled

to re-make its work force several times over before work could begin.  Thereafter, the record is

replete with evidence that manpower and cash flow problems, rather than unreasonable treatment

by USACE, crippled ECC's performance, and caused the schedule to slip later and later.

Moreover, even according to ECC's own expert in this litigation, half of the delays that the

project experienced are non-excusable, totaling *5.8 months* of systemic ECC delay that occurred

in approximately 27 months of project duration.  As we will show, this is a magnitude of non-

excused delay that is significant enough on its own to support a termination for failure to

perform, particularly considered in the overall context of ECC's repeated schedule failures, and

subcontractor problems.

**II.      As A Matter Of Law, Because Of Its Conclusive Default, ECC Is Not Entitled To Delay Damages, Or Its Actual Costs Incurred In Performance**

Under the FAR, a contract may be terminated for convenience or default, and the FAR

provides a comprehensive scheme to resolve both termination types.  A "convenience

termination clause provides for termination whenever the contracting officer shall determine that

such termination is in the best interest of the Government.  It is designed to provide a mechanism

whereby the Government may end its obligation on a contract and yet limit its liability to the

contractor's costs and profits on the preparations made and work done." *Colonial Metals Co. v.

United States*, 494 F.2d 1355, 1360 (Ct. Cl. 1974) (overruled on other grounds by *Torncello v.

United States*, 681 F.2d 756 (Ct. Cl. 1982)).  In a convenience termination scenario, the

contractor recovers its allowable costs and reasonable profit, less payments already received

under the contract.  FAR § 49.201; *see also* 2 Bruner & O'Connor Construction Law § 5:270

(July 2022 update) ("Upon the termination of the contract for the owner's convenience, the

contractor shall be entitled to receive payment for the work executed, and costs incurred by

reason of such termination, along with reasonable overhead and profit on the work not

executed.").  After a termination for convenience, the contractor submits its monetary claims to

the contracting officer, including any requests for equitable adjustment to increase the contract

price to reduce the downward effect of any loss adjustment that may be applied to its termination

for convenience recovery.  *See* FAR § 49.203.  If the contractor is dissatisfied with the

contracting officer's resolution of its settlement proposal and brings a timely action to challenge

it, then this Court would have jurisdiction to review the dispute and adjudicate the contractor's

requests for equitable adjustment.

In contrast, a default termination is "generally the exercise of the Government's

contractual right to completely or partially terminate a contract because of the contractor's actual

21

or anticipated failure to perform its contractual obligations."  FAR § 49.401(a).  It is a "drastic sanction" that has significant consequences.  *Lisbon*, 828 F.2d at 765 (Fed. Cir. 1987).  In this case, ECC – a conclusively defaulted contractor – is seeking all the costs that it incurred on the project prior to its termination, *i.e.*, convenience termination costs (which ECC inaccurately labels as damages due for a breach of the implied duty of good faith and fair dealing), and alleged delay damages.  However, as a matter of law, it can recover none of these.

In a default termination scenario, the defaulting contractor's monetary recovery is limited only to payment for work completed and accepted by the Government at the time of termination, and the defaulting contractor may end up owing the Government reprocurement costs.  *See Bowman Constr. Co. v. United States*, 154 Fed. Cl. 127, 141-42 & n.7 (2021) (citations omitted); FAR § 49.402-2.  So, to recover costs expended in performing a project following a default termination, the defaulted contractor must first successfully challenge the default termination such that it is converted to a convenience termination, after which the contractor may obtain convenience termination costs.  *Bowman*, 154 Fed. Cl. at 140.  The only precedential exception to this rule arises when the contractor seeks costs arising from an earlier Government breach that is unrelated to the later default termination.  *See id.* at 141-42 (citing *Laka Tool & Stamping Co. v. United States*, 650 F.2d 270 (Ct. Cl. 1981)).

This Court has found that a contractor that is indisputably in default cannot recover project costs, including costs associated with alleged contract delays, defective specifications, differing site conditions, and breaches of the duty of good faith and fair dealing.  *Bowman*, 154 Fed. Cl. at 135-36, 141-42.  This is so because these kinds of project costs relate to issues the Court must consider (as defenses) when a contractor is contesting a default termination, and they are also the type of costs that could be recovered in a convenience termination settlement.  *Id.*

22

When, however, there is a final and conclusive default, a contractor cannot later raise "related" claims to support an affirmative monetary claim of these types of project causes because they would have been subsumed in relief granted in a timely successful challenge to the default termination.  *Id.* at 141.  The only permissible monetary recovery for a contractor, like ECC, whose default is final and conclusive, is payment for work that has been accepted by the Government and for which the contractor has not been paid.  FAR § 49.402-2(a).  Putting aside that ECC does not allege that it is owed any such outstanding payments, the work that ECC left undelivered was the contract's sole object—*i.e.*, facilities that were complete by the contract's substantial completion date.  Thus, none of ECC's costs—beyond those already paid—in unsuccessfully attempting to provide a completed facility past that substantial completion date are recoverable.

As discussed in greater detail in our motion *in limine* (ECF No. 71 ), although we are aware of two non-precedential cases in which this Court has permitted a defaulted contractor to pursue a later suit for contract performance costs, *Kenney Orthopedic, LLC v. United States*, 88 Fed. Cl. 688 (2009), and *Roxco Ltd. v. United States*, 60 Fed. Cl. 39 (2004), neither case cites, relies upon, or constitutes authority permitting the Court to rewrite the plain and express terms of the contract's default provision, not to mention the FAR itself.  All the costs that ECC seeks in this litigation are barred by its conclusive default.

### III.  Even If ECC Could Overcome The Bar Of Its Conclusive Default, Its Delay And Damages Models Are Fatally Flawed And Do Not Support Recovery

As an initial matter, it appears that ECC may be seeking a double recovery in a context where the law does not permit a party to be made more than whole.  *See Hansen Bancorp, Inc. v. United States*, 367 F.3d 1297, 1315 (Fed. Cir. 2004) ("Courts should avoid bestowing an 'unfair windfall' on the plaintiff by compensating him or her above and beyond the losses suffered

under the breached agreement.") (citation omitted).  ECC appears to seek (1) approximately $2 million associated with delays to the project's critical path, *i.e.*, the costs incurred by ECC each day that it was forced to perform work on the project beyond the anticipated substantial completion due to purported Government delay, *and* (2) $11 million representing its alleged actual costs incurred from all causes, *including purported Government delays*.  ECC offers no rationale for its apparent demand for both, and, indeed, there is none.

Against this background, ECC's model of delay and associated damages is fundamentally flawed.  As we stated at the outset of this brief, a major theme of ECC's case is telling only part of the story, i.e., not acknowledging and accounting for the ECC-caused manpower and cash flow problems that caused or contributed to delays on the project.  This is best exemplified in the delay modeling by ECC's expert, Rebecca Smith, who only claims to have measured purported Government-caused delay, and labels all that delay "compensable," without accounting for any concurrent delays that are ECC's responsibility.

Putting aside the inherent bias and credibility problems with this approach, Ms. Smith's approach also creates a fundamental and fatal flaw in ECC's case from a legal perspective.  "The general rule is that "'[w]here both parties contribute to the delay neither can recover damage[s], unless there is in the proof a clear apportionment of the delay and expense attributable to each party." *Blinderman Constr. Co. v. United States,* 695 F.2d 552, 559 (Fed. Cir. 1982) (quoting *Coath & Goss, Inc. v. United States*, 101 Ct. Cl. 702, 714–715 (1944)).  "Courts will deny recovery where the delays are concurrent and the contractor has not established its delay apart from that attributable to the government.  *P.R. Burke Corp. v. United States*, 277 F.3d 1346, 1359 (Fed. Cir. 2002) (quoting *William F. Klingensmith, Inc. v. United States*, 731 F.2d 805, 809 (Fed. Cir. 1984)).  Thus, Ms. Smith's failure to account for ECC's concurrent delay with any sort

24

of apportionment will invariably result in an absolute failure of proof at trial as to the days of delay for which the Government could be legally liable.

ECC's delay claims also fail through the application of a flawed, and significantly inflated, "daily rate" or "burn rate" to Ms. Smith's days of delay, which reflects core conceptual flaws, includes several improper costs, and in no way accurately represents the amounts that ECC could possibly be due.  As such, ECC's claims – which are absolutely barred on claim preclusion, issue preclusion, and statute of limitations, and are impermissible under the FAR's default clause – will also falter on proof of quantum.  As such, the Government is entitled to judgment in its favor.

## <u>CONCLUSION</u>

The evidence and testimony presented at trial will demonstrate that ECC was properly terminated for default, and is entitled to no damages.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. MCCARTHY
Director

s/ Eric P. Bruskin
ERIC P. BRUSKIN
Assistant Director

OF COUNSEL:

REBECCA L. BOCKMANN
Deputy District Counsel
U.S. Army Corps of Engineers
Middle East District

s/ A. Bondurant Eley
A. BONDURANT ELEY
Senior Litigation Counsel
ERIC LAUFGRABEN
Senior Trial Counsel
BRITTNEY WELCH
Trial Attorney
Commercial Litigation Branch
Civil Division

25

Department of Justice
P.O. Box 480, Ben Franklin Station
Washington, D.C.  20044
Telephone: (202) 616-8254
Facsimile: (202) 305-2062
Email: Bondurant.Eley@usdoj.gov

June 26, 2023                    *Attorneys for Defendant*