# In the United States Court of Federal Claims

No. 21-1169

Filed: August 25, 2023

---

**ECC CENTCOM CONSTRUCTORS, LLC,**

                                    *Plaintiff,*

**v.**

**THE UNITED STATES,**

                                    *Defendant.*

---

*Roy Dale Holmes*, Cohen Seglias Pallas Greenhall & Furman, Philadelphia, PA, for Plaintiff.

*Bret Vallacher*, *Eric Laufgraben*, *Bondurant Eley*, and *Brittney Welch*, Trial Attorneys, Commercial Litigation Branch, Civil Division, *Eric P. Bruskin*, Assistant Director, *Patricia M. McCarthy*, Director, *Brian M. Boynton*, Principal Deputy Assistant Attorney General, U.S. Department of Justice, Washington, D.C., with *Rebecca Bockmann*, Assistant Counsel for U.S. Army Corps of Engineers, Winchester, VA, for Defendant.

## MEMORANDUM OPINION AND ORDER

**TAPP, Judge.**

Claim preclusion prevents parties from raising issues that could have been raised and decided in a prior action—even if those claims were not *actually* litigated. *Lucky Brand Dungarees, Inc. v. Marcel Fashions Grp., Inc.*, 140 S. Ct. 1589, 1594 (2020). Stated differently, when litigation advances the same claim as an earlier suit between the same parties, the earlier suit's judgment prevents litigation of all grounds for, or defenses to, recovery that were previously available to the parties. *Id.* (inner citations and quotations omitted). Unlitigated claims are barred if they share a common nucleus of operative facts, regardless of whether they were determined in the prior proceeding. *Id.* at 1595.

In this action, Plaintiff, ECC CENTCOM Constructors, LLC ("ECC"), asserts five claims—most of which were previously before the Armed Services Board of Contract Appeals or should have been submitted to the contracting officer and asserted in the earlier action. The United States moves for summary judgment, largely citing the doctrine of claim preclusion. (Defendant's Motion for Summary Judgment ("Def.'s Mot. Summ. J."), ECF No. 60). Because many of ECC's claims are based on the same transactional facts as claims that already were—or should have been—litigated, Counts I, II, III, and V are precluded in this action. On those counts, judgment is warranted for the United States. As to Count IV, however, a genuine issue of material facts exists, thereby impeding judgment.

## I.   Background

### A.   Underlying Contract

On November 29, 2012, the United States Army Corps of Engineers ("USACE") issued a Request for Proposal ("RFP")[1] seeking bids for the design and construction of the Transient Quarters ("TQ") and Dining Facility ("DFAC") in Manama, Bahrain, ("Task Order 6"). (Def.'s Mot. Summ. J. A304–60).[2] The RFP identified the Projection Manager, Site Superintendent, Quality Control Systems Manager, and Site Safety Health and Environmental Officers as "Key Personnel," and stated that "[m]ore weight will be given for: Key Personnel with experience on at least three (3) projects of similar size, scope, and complexity" and for "Key Personnel with ten (10) or more years of relevant job experience that is related to the position they will hold on this project." (*Id*. A310(ii)). On February 19, 2013, ECC submitted its proposal package for Task Order 6. (*Id*. A363–422). On September 11, 2013, USACE awarded the contract to ECC for $40,301,215.55. (*Id*. A426). The terms of the contract required ECC to complete all TQ/DFAC work within 710 days of receipt of the Notice to Proceed. (*Id*.; *see also id*. A442).

Soon after award, on September 24, 2013, USACE notified ECC that a bid protest filed in relation to Task Order 6 must be resolved before USACE would issue the relevant Notice to Proceed. (Sec. Am. Compl. at 3, ECF No. 58; Def.'s Mot. Summ. J. A2668). As a result, USACE instructed ECC "not to incur any costs associated with the Task Order." (Sec. Am. Compl. at 3; Def.'s Mot. Summ. J. A2802). ECC claims that because of this directive and the uncertain duration of the bid protest, ECC reassigned its intended "Key Personnel" to other projects.[3] (Sec. Am. Compl. at 3; Def.'s Mot. Summ. J. A2803).

On January 2, 2014, once the pending bid protest was resolved, USACE issued the Notice to Proceed, establishing a contract completion date of December 13, 2015. (Def.'s Mot. Summ. J. A2055–56). On January 9, 2014, ECC funneled the Notice to Proceed to its subcontractor to "begin site survey work, the geotechnical survey, to do test piles, and to install temporary fencing, project office buildings, utilities, and other mobilization activities." (Sec. Am. Compl. at 4). On the same date, ECC also informed the USACE Project Manager of its plan to commence work the week of January 20 and requested authorization for approval of substituted ECC staff. (*Id*.). ECC requested that authorization because it had reassigned personnel due to the bid protest. (Def.'s Mot. Summ. J. A2898). USACE did not immediately

---

[1] Contract No. W912ER-11-D-0010-0006.

[2] The United States' Motion for Summary Judgment is accompanied by a consecutively paginated Appendix amounting to 3,179 pages. (*See* Def.'s Mot. Summ. J., ECF Nos. 60-1–4). The Court will cite to that Appendix using "Def.'s Mot. Summ. J. A__".

[3] The United States disagrees with this effect, arguing that contemporaneous communications reveal that immediately after receiving the award—and before any bid protest was filed—ECC anticipated starting in January 2014. (Def.'s Mot. Summ. J. at 4 (citing Def.'s Mot. Summ. J. A2040)). Because this fact is not determinative of the outcome of this protest, the Court views it in a light most beneficial to ECC.

approve the personnel ECC submitted to oversee pre-construction and mobilization activities. (*Id*.).[4]

On March 4, 2014, ECC sought permission from USACE's Contracting Officer ("CO") to substitute its proposed Key Personnel—namely the proposed Site Superintendent, Site Safety, Health, and Environmental Officer ("SSHO"), and Quality Control Systems Manager—on an interim basis. (Def.'s Mot. Summ. J. A2114). On March 5, 2014, the CO denied ECC's request, stating that ECC could only start initial mobilization activities with Key Personnel listed in its initial Technical Proposal. (*Id*. A2131–41). The CO explained that, during the award process, "[m]ore weight was given to firms whose Key Personnel not only met required qualifications but whose experience exceed[ed] requirements[,]" and that temporary substitutions would be unfair to other bidders. (*Id*. A2142–44).

On March 13, 2014, ECC requested a permanent substitution of Key Personnel and proposed a new Project Manager, Site Superintendent, Quality Control Systems Manager, and SSHO. (Def.'s Mot. Summ. J. A2145–46). In that request letter, ECC acknowledged that the "TQ/DFAC award was a Best Value award with high emphasis placed on [ECC's]management team," but explained that "[d]ue to the [over eleven] month period from proposal submission to resolution of the protest, final award and [Notice to Proceed,] [the] originally proposed Key Personnel were assigned to and continue to work other critical projects . . . ." (*Id*. A2145).[5]

As an interim solution, on March 20, 2014, ECC requested CO approval for the personnel ECC proposed on March 13 as temporary replacements limited to site surveys while the CO reached a permanent substitution decision. (Def.'s Mot. Summ. J. A2161). On April 1, 2014, the CO granted that request and approved the newly proposed personnel "[o]n a temporary basis for the TQ/DFAC site surveys only[,]" and informed ECC that he intended to issue a formal decision on whether those personnel could be permanent substituted by the end of the following week.

---

[4] According to the United States, ECC improperly attempted to substitute its Key Personnel by seeking permission from the Contracting Officer Representative—not the Contracting Officer. (Def.'s Mot. Summ. J. at 5 (citing Def.'s Mot. Summ. J. A2057, A2097)). This does not affect the Court's ruling and thus will not be substantively addressed.

[5] The United States suggests that ECC's failure to re-assign personnel may be in bad faith. (Def.'s Mot. Summ. J. at 6–7). The original proposed project manager worked on another project in Afghanistan from May to December 2013, (*Id*. A2662), and then a different project for another ECC entity in Afghanistan from at least February to April 2014, instead of working on Task Order 6 once the Notice to Proceed issued. (*Id*. A2063, A2165). The United States goes on to state that ECC's proposed SSHO worked on another project in Afghanistan from May to December 2013, thus they were available to start working on Task Order 6 in January 2014. (*Id*. A2667). Further, United States argues that ECC did not attempt to employ its original Key Personnel on Task Order 6 until after the Notice to Proceed. (*See id*. A3163 ("[B]efore my name was submitted they didn't ask me if I was willing to go to Bahrain[.]"); *id*. A3163 33:10–20; *id*. A3160 30:3–13 (Mr. Scott House was not notified that he was going to Task Order 6 about three weeks into his leave, around July or August 2014)).

3

(*Id*. A2160). The CO ultimately approved the SSHO and Site Superintendent, (*id*. A2168), but denied the request to substitute the Quality Control Systems Manager because he did not have equivalent experience in that role as the previously proposed personnel. (*Id*.). Likewise, the CO disapproved ECC's proposed permanent Project Manager because he was also managing an adjacent project. (*Id*.). For the two months that followed, ECC and the USACE's CO danced over these personnel substitutions for a variety of reasons, including immigration issues. (*See id*. A2172–73; A2190). By June 20, 2014, the CO had approved all Key Personnel substitutions. (*Id*. A2198).

Time passed. On May 1, 2015, ECC submitted a proposal regarding the "Gravity Feed to Sewage Lift Station" (what would become the subject of Modification 16) and requested $478,394 in additional compensation but stated that "ECC [was] not seeking additional period of performance with this change." (Def.'s Mot. Summ. J. A2255). However, issues arose necessitating more time to complete the project. (*See id*. A2277–82). On July 29, 2015, ECC submitted a revised proposal requesting $411,208.54 in additional compensation but reiterated that it was not "seeking additional period of performance with this change." (*Id*. A2283). On December 29, 2015, USACE unilaterally issued Modification 16, which revised the Gravity Feed to Sewage Lift Station without changing the contract's period of performance. (*Id*. A2338–40).

### B.   Show Cause and Termination

In the winter of 2015, after several other modifications were issued, the CO determined that ECC could not meet its December 13, 2015 completion deadline due to a November 18 invoice indicating that ECC had only earned approximately thirty-seven percent of the contract-value. (Def.'s Mot. Summ. J. A2332 ("$16,410,830.88" earned out of "43,944,525.59")). ECC submitted a schedule on November 16 projecting a completion date of August 31, 2016—two hundred and sixty-two days past the original required contract completion date. (*Id*. A2322).

On December 30, due to the expired completion deadline, USACE issued a Show Cause letter. (Def.'s Mot. Summ. J. A2341–43). The Show Cause letter indicated that to avoid default termination, ECC must respond with a new recovery plan and schedule that was both realistic and acceptable; the plan was required to provide the CO with an understanding of when ECC would complete the project. (*Id*.). On January 9, 2016, ECC responded, asserting that "it [was] owed additional time for delays due to causes beyond ECC control," including delays due to mobilization, weather, Bahrain Government restrictions, and security, as well as delays for concrete delivery, material shortages, and reduced labor on-site due to those shortages. (*Id*. A2344). ECC's response also included a new project completion date of August 31, 2016. (*Id*. A2351). ECC updated those projections via a Project Schedule Revision on March 4, 2016, and indicated that the project was fifty-six percent complete. (*Id*. A2542). But rather than the previous completion date, ECC planned to turn over the project to USACE on November 30, 2016. (*Id*. A2543).

On April 14, USACE extended contract performance by three days (to December 16, 2015) considering some merit to ECC's request for an equitable adjustment due to weather delays. (Def.'s Mot. Summ. J. A2615–16 (Modification 20)). Even so, on April 19, 2016—one hundred twenty-four days past the December 16, 2015 completion date—USACE terminated ECC's contract finding, among other things, that "ECC [was] in default on the Contract for

failure to meet construction progress schedules, to diligently prosecute the work, and to complete the work required under the subject contract by the required date." (*Id.* A2617–29).

### C.   *ASBCA Litigation*

On June 23, 2016, ECC appealed its termination for default to the Armed Services Board of Contract Appeals ("ASBCA"). (Def.'s Mot. Summ. J. A2628–49). ECC alleged that delays in awarding the contract and in resolving the bid protest resulted in "ripple" effects causing delays, including that its original Key Personnel were reassigned to other projects during the bid protest, that USACE allegedly delayed approving ECC's proposed substitutes, and that Bahrain's government suspended the normal processing of visas, all of which allegedly pushed construction into extreme weather and caused ECC to encounter shortages of concrete masonry unit materials. (*Id.* A2635–42). In addition, ECC argued that the CO lacked factual and legal support for termination, relied on irrelevant information to support his decision, and failed to comply with FAR requirements. (*Id.* A2646–47).

The ASBCA heard ECC's case from July 10–14, 2017. (Def.'s Mot. Summ. J. A2863). After that five-day proceeding, the parties submitted extensive briefing. ECC again argued that the termination was wrongful, arbitrary, and capricious because: "USACE (1) failed to meaningfully consider the required FAR 49.402-3(f) factors; (2) failed to reconcile conflicting information regarding [ECC]'s actual progress and ability to complete; (3) relied upon irrelevant financial information;" and (4) "refused to quantify the excusable delay or consider it" even though USACE issued modifications recognizing that some additional time was warranted and providing that additional time. (*Id.* A2860). Additionally, ECC argued that it "was entitled to time extensions, and liquidated damages were sufficient to protect the government for the remaining delay, if any." (*Id.*).

Ultimately, the ASBCA denied ECC's termination challenge, (Def.'s Mot. Summ. J. 2863–96), concluding that "the [CO] acted reasonably in terminating [ECC's] contract for failure to complete on time[,]" (*id.* A2896). In an exhaustive, thirty-three-page opinion, the ASBCA held that the United States met its burden of proving that ECC did not perform in a timely manner and affirmed the CO's decision. (*Id.* A2881). In coming to that conclusion, the ASBCA found that the CO made the evaluation required by FAR 49.402-3(f),[6] (*id.* A2888), reasonably "considered the record before termination," (*id.* A2891), and did not rely on "irrelevant financial information as the basis to terminate," (*id.* A2894 (cleaned up)). It further found that, to the extent ECC raised a hot weather delay claim separate from the material shortage claim, ECC's

---

[6] Under FAR 49.402-3(f), a contracting officer shall consider the following factors in determining whether to terminate a contract for default:
   1) The terms of the contract and applicable laws and regulations.
   2) The specific failure of the contractor and the excuses for the failure.
   3) The availability of the supplies or services from other sources.
   4) The urgency of the need for the supplies or services and the period of time required to obtain them from other sources, as compared with the time delivery could be obtained from the delinquent contractor.

claim failed on the merits, finding that "there is a failure of proof for any weather delays beyond those granted by the [CO]." (*Id*. A2879; A2877–78 ("We find that the conclusions of ECC's expert were not persuasive in convincing us that there was significant weather delay that would entitle ECC to additional time.")).

As to ECC's excusable delay arguments, the ASBCA held that it lacked jurisdiction because ECC failed to present these claims to the CO as required under *M. Maropakis Carpentry, Inc. v. United States*, 609 F.3d 1323 (Fed. Cir. 2010), and *Securiforce International America, L.L.C. v. United States*, 879 F.3d 1354 (Fed. Cir. 2018). (Def.'s Mot. Summ. J. A2885). The ASBCA explained that "a contractor contesting liquidated damages or a default termination due to excusable delay must submit a claim for a time extension [to the CO] before appealing to the Board." (*Id*.). There is nothing in the record showing that ECC was precluded from satisfying this requirement prior to the ASBCA litigation. The ASBCA declined ECC's request to stay the ASBCA's review to allow time for ECC to present its delay claims to the CO. (*Id*. A2888). The ASBCA reasoned the request was untimely and that staying the case for ECC to present its delay claims to the CO was futile because ECC's own expert testified that only one-hundred and forty-seven total days were possibly excusable out of the three-hundred and fifty-three days of delay. (*Id*. (citing *Empire Energy Mgmt. Sys., Inc. v. Roche*, 362 F.3d 1343, 1351–52 (Fed. Cir. 2004))). Stated differently, the ASBCA held that, even had ECC suffered its alleged excusable delays, the distinction was negligible, and the CO would still be justified in its decision to terminate. Ultimately, the ASBCA concluded that "the [CO] acted reasonably in terminating the contract for failure to complete on time," and denied ECC's appeal. (Def.'s Mot. Summ. J. A2896).

ECC appealed the ASBCA's decision to the Court of Appeals for the Federal Circuit, challenging in relevant part the ASBCA's finding that the CO's termination decision was reasonable, and arguing that that the ASBCA "abused its discretion when it refused to stay ECC's appeal proceedings and [] foreclosed" ECC from presenting its claims to CO. The Federal Circuit summarily affirmed the ASBCA decision on October 11, 2019. *ECC Centcom Constructors, LLC v. Sec'y of Army*, 779 F. App'x 750 (Fed. Cir. 2019).

### D.  Certified Claims and Procedural History

Two years following the ASCBA decision and two months after the Circuit affirmed, ECC submitted a certified claim on December 31, 2019, seeking a "time extension of 273 days, withdrawal of all assessed liquidated damages, delay damages of $2,534,827.23, a conversion of the wrongful termination for default to one for convenience, and withdrawal and reevaluation of the [Contractor Performance Assessment Reporting System (CPARS)] rating[,]" (2019 Claim). (Def.'s Mot. Summ. J. A2897–982). This claim asserts the same delays that ECC failed to request before its ASBCA appeal. On February 25, 2020, a USACE CO informed ECC that a Final Decision would not be issued for the certified claim. (Compl. at 1, ECF No. 1).

On April 8, 2021, ECC filed its Complaint before this Court challenging the same termination and offering the same excuses for its inability to complete the project by the deadline. (*See* Compl.). ECC's original Complaint demanded: (1) $2,534,827.23 in alleged delay damages, as requested in the 2019 Claim; and (2) $11,369,865.30 in alleged "breach damages." (Compl. ¶ 75). On September 10, 2021, the United States moved to dismiss the demand for $11 million in breach damages for lack of jurisdiction on the grounds that ECC failed to present it to

the CO. (ECF No. 13). On January 21 of 2022, the Court issued an Opinion on the United States' partial motion to dismiss, holding that "because ECC submitted a certified claim for 'failure to cooperate' [was] based on the same operative facts alleged in Count I of its Complaint, ECC effectively presented the same claim to the [CO]." *ECC CENTCOM Constructors, LLC v. United States*, __ Fed. Cl. ___, 2022 WL 20358628 (Fed. Cl. Jan. 21, 2022). However, "because the certified claim [did] not assert 'breach damages' directly related to the violation of good faith and fair dealing, any new theory of damages [was] outside of the Court's jurisdiction." *Id*. The United States' Motion was therefore granted in part. After that ruling, on February 7, 2022, ECC sent the CO a second certified claim to cure the jurisdictional defect (2022 Claim). (First Am. Compl., ECF No. 31). The 2022 Claim sought all costs incurred by ECC on the contract, plus overhead, profit, and payments to its surety, less contract payments already received. (Def.'s Mot. Summ. J. A2982–3004).

Following the CO's denial of the 2022 Claim, on April 28, 2022, ECC amended its Complaint. (First Am. Compl.). ECC amended its Complaint for the second and final time after the close of discovery. (Sec. Am. Compl.). To summarize, the operative Complaint asserts the following claims:

| Count | Basis | Delay Damages | Breach Damages |
|---|---|---|---|
| Count I | USACE allegedly violated its duty of good faith and fair dealing by not timely responding to ECC's personnel substitution requests. | 196 calendar days of delay and delay damages of $1,076,343.33. | $11,369,865.30 comprised of ECC's costs (plus overhead, profit, and surety payments) *less* payments received from USACE. |
| Count II | ECC allegedly incurred additional delays due to concrete aggregate material shortages. | 65 calendar days of delay and delay damages of $671,597.69. | |
| Count III | ECC allegedly incurred additional delays due to USACE's issuance of Modification 16 without providing ECC with additional time to complete the project. | 33 calendar days of time extension and $308,168.52 in delay damages. | |
| Count IV | ECC's CPARS rating is allegedly improper and must be withdrawn and re-evaluated. | N/A | N/A |
| Count V | ECC's termination for default allegedly must be converted into a termination for convenience. | N/A | N/A |

(*See* Sec. Am. Compl. ¶¶ 13–99).

## II.    Discussion

The United States moves for Summary Judgment as to each of ECC's claims. (*See* Def.'s Mot. Summ. J.). It argues that ECC's termination and delay claims are barred by the doctrine of claim preclusion because ECC already challenged its termination before the

ASBCA on several grounds, including by attempting to raise the same excusable delays it previously litigated. (*See id*. at 18–25). The ASBCA specifically found that termination for default was reasonable, and ECC deprived the ASBCA of jurisdiction of its delay claims by failing to properly present those claims to the CO. (Def.'s Mot. Summ. J. A2863–96).

The Court concludes that the Complaint before it arises from the same contract and involves the same parties and operative facts as the prior appeal before the ASBCA. The related ASBCA decision necessarily precludes its counterparts here. as Counts I, II, III, and V present issues that were either raised or should have been raised in the prior ASBCA proceeding. However, as to Count IV, the Court finds that a dispute over material facts exists as to the propriety of ECC's CPARS rating and whether reevaluation is in order.

A.    *Legal Standard*

The Court may grant summary judgment if the pleadings, affidavits, and evidentiary materials filed in a case reveal that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." RCFC 56(a). The moving party bears the initial burden to demonstrate the absence of any genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Facts are material if they "might affect the outcome of the suit." *Anderson v. Liberty Lobby*, *Inc*., 477 U.S. 242, 248 (1986). A genuine factual dispute exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. A party seeking to establish a genuine dispute of material fact must "cit[e] to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations [ ], admissions, interrogatory answers, or other materials." RCFC 56(c)(1)(A).

While "inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion," *United States v. Diebold*, *Inc*., 369 U.S. 654, 655 (1962), summary judgment may still be granted when the party opposing the motion submits evidence that "is merely colorable . . . or is not significantly probative." *Anderson*, 477 U.S. at 251 (internal citation omitted). Courts may only grant summary judgment when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita*, *Elec*. *Indus*. *Co*., *Ltd*. *v. United States*, 475 U.S. 574, 587 (1986) (quoting *First Nat. Bank of Ariz*. *v. Cities Serv. Co*., 391 U.S. 253, 289 (1968)).

B.    *Claim Preclusion*

Claim preclusion, or the doctrine of res judicata, "foreclose[es] any litigation of matters that never have been litigated, because of a determination that they should have been advanced in an earlier suit." *Phillips/May Corp. v. United States*, 524 F.3d 1264, 1267 (Fed. Cir. 2008). The Supreme Court has "stressed that the doctrine of res judicata is not a mere matter of practice or procedure inherited from a more technical time than ours," but rather, it is "a rule of fundamental and substantial justice, of public policy and of private peace, which should be cordially regarded and enforced by the courts." *Federated Dep't Stores*, *Inc*. *v. Moitie*, 452 U.S. 394, 401 (1981) (cleaned up). A final judgment on the merits "puts an end to the cause of action, which cannot again be brought into litigation between the parties upon any ground whatever," and "it is a finality as to the claim or demand in controversy not only as to every matter which was offered

and received to sustain or defeat the claim or demand, *but as to any other admissible matter which might have been offered for that purpose*." *Nevada v. United States*, 463 U.S. 110, 129–30 (1983) (cleaned up) (emphasis added).

Recently, this Court held that "the applicability of claim preclusion does not depend on establishing that the prior action resulted in a final judgment as to identical issues or identical claims." *Avant Assessment*, *LLC v. United States*, 159 Fed. Cl. 632, 638 (2022) (citing *Bowers Inv. Co*., *LLC v. United States*, 695 F.3d 1380, 1383–84 (Fed. Cir. 2012)). The Court found that the contention that the ASBCA did not enter judgment on the claims in that case did not change the analysis and that, since the ASBCA reached a final judgment generally, the doctrine of claim preclusion was satisfied. *Id*. "[T]he general rule [is] that all claims arising out of the same contract constitute the same claim for purposes of res judicata," *Phillips/May*, 524 F.3d at 1273, such that "claims under a single contract generally must be brought together," *id*. at 1271. A contractor can only "overcome this presumption 'by showing that the claims are unrelated.'" *Avant Assessment*, 159 Fed. Cl. at 638 (quoting *Phillips/May*, 524 F.3d at 1272).

1.    Counts I, II, III, and IV are precluded.

Claim preclusion applies when: "(1) the parties are identical or in privity; (2) the first suit proceeded to a final judgment on the merits; and (3) the second claim is based on the same set of transactional facts as the first." *Ammex*, *Inc*. *v. United States*, 334 F.3d 1052, 1055 (Fed. Cir. 2003). Here, ECC does not challenge the first prong. The second prong, whether the first suit proceeded to judgment on the merits, is highly contested. This is because, as ECC points out, while the ASBCA decision was on the merits, the claims ECC revisits in this suit were dismissed for lack of jurisdiction. (Transcript of Final Pretrial Conference 7/10/2023 ("Tr.") 6:3–9, ECF No. 89 (ECC Counsel: "We don't think res judicata applies to those particular claims because they have never been filed, they have never been ruled on by the Board. The Board found they had no jurisdiction to rule on those, and so for that reason we think that the relevant case law indicates that distinct claims can be filed and considered.")). The Court finds, and case law supports, this distinction makes no difference.

As mentioned above, this Court recently applied the doctrine of claim preclusion in similar circumstances where a jurisdictional defect before the ASBCA was solely due to the contractor's failure to timely submit all of its claims. *See Avant Assessment*, 159 Fed. Cl. at 639. In *Avant*, after a successful conversion of termination, the CO denied Avant's claims for termination costs. *Id*. Avant appealed to this Court but sought relief not earlier presented to the CO via a certified claim. *Id*. As for the additional relief, "the ASBCA dismissed [many] of Avant's claims for lack of jurisdiction [for failing to present those claims to the CO] but did enter judgment on the claims over which it had jurisdiction." *Id*. Avant argued that the ASBCA's exercising jurisdiction over some of those claims "was not a final judgment on the merits of the claims at issue in the Complaint[.]" *Id*. at 638. The Court rejected that argument. *Id*.

*Avant* iterates that claim preclusion does not depend on establishing that the prior action resulted in a "final judgment as to identical issues or identical claims." *Avant Assessment*, 159 Fed. Cl. at 638. The Court explained that it was irrelevant that the ASBCA "did not enter judgment on the claims in this case" because it was sufficient that the "ASBCA reached a final judgment" on the case generally. *Id*. Based on that finding, the Court considered "whether Avant

could have and should have brought its current claims in the ASBCA litigation." *Id*. The Court held that the lack of subject matter jurisdiction in the initial action generally supported claim preclusion where some issues in the appeal were decided on the merits and "the jurisdictional defect before the ASBCA was solely due to Avant's failure to submit all its claims to the [CO] at one time." *Id*. at 639. Quoting *Phillips/May*, the Court concluded that Avant was "obligated to prosecute its claims in the same proceeding," and therefore, "Avant gets no second bite at the apple in this Court." *Id*.

The logic of *Avant* is rational, otherwise, the Court would need to read away the caveat that claim preclusion applies to claims that could or should have been brought in earlier litigation. Here, ECC appealed its default termination to the ASBCA but did not first seek a CO's decision for excusable delays. (Def.'s Mot. Summ. J. A2885). The ASBCA issued a judgment on the merits upholding the CO's decision to terminate ECC for default because ECC failed to timely complete its contract. (Def.'s Mot. Summ. J. A2896). The ASBCA held that ECC failed to properly advance its delay claims when it challenged its termination for default because ECC did not comply with the rule that "a contractor contesting . . . a default termination due to excusable delay must submit a claim for a time extension [to the CO] before appealing to the Board." (Def.'s Mot. Summ. J. A2885); *see also M. Maropakis Carpentry*, 609 F.3d at 1331 (a "contractor seeking an adjustment of contract terms," whether "asserting the claim against the government as an affirmative claim or as a defense to a government action," requires presentment to the CO prior to adjudication).

Contrary to ECC's contentions, the litigation before the ASBCA was ECC's appeal to the United States' termination, but that does not mean that it was the United States' claim as ECC seeks to characterize it. (Tr. 7:8–10 (ECC Counsel: "So the claim that the Board looked at was actually the Government's claim, not the contractor's claim.")). And a finding that such faulty characterization is determinative would ignore case law explicitly holding that claim preclusion applies to affirmative defenses and counterclaims if they arise from the same nucleus of transactional facts. *See Lucky Brand Dungarees*, 140 S. Ct. at 1594. To support its claim, ECC cites *Malone v. United States*, 849 F.2d 1441, 1445 (Fed. Cir. 1988), but that case is inapplicable. *Malone* dealt with an appeal of a termination for cause and held that a contractor may assert a prior material breach as a defense to a termination for cause without first submitting a breach of contract claim to a CO for a final decision, when the relief sought is a declaration that the termination for cause was improper. 849 F.2d at 1445. This may be relevant to the immediate appeal from a CO's decision to terminate—which here would have been to the ASBCA. Reliance on *Malone* at this stage would require this Court to revisit ASBCA's findings that were summarily affirmed by the Federal Circuit. *ECC Centcom Constructors*, 779 F. App'x at 750. This is improper and unpersuasive.

Similarly, ECC also relies on the CO establishing "appeal rights" in the 2022 Claim. (Pl.'s Resp. at 33, ECF No. 75; *see also* Tr. 12:5–11 (ECC Counsel: "[W]hen we filed our revised claim after you correctly ruled that we didn't have all of our damages in the original claim, we got a final decision, and he evaluated all of the issues in this case on the merits, and we think that that is a reconsideration by the Government, and he gave us our appeal rights in that decision.")). This reliance is misplaced. COs may exercise discretion in renewed claims by expressly denying a claim or by being silent within the required period. 41 U.S.C. § 7103(f). However, COs cannot confer jurisdiction by issuing, or not issuing, a decision. *Santa Fe*, *Inc. v.*

*United States*, 13 Cl. Ct. 464, 467 n.1 (1987) ("A contracting officer cannot bestow jurisdiction upon a court where it does not exist."). Moreover, a CO's incorrect advice regarding a contractor's appeal rights certainly does not create jurisdiction where none exists. *Palafox St. Assocs.*, *L.P. v. United States*, 122 Fed. Cl. 18, 37 (2015) (internal citations omitted). If filing a renewed claim at the CO renewed jurisdiction, effectively allowing plaintiffs to turn back time, there would be no finality to any decision and no preclusive effect. Statutes of limitations would mean nothing. The result would be mayhem.

Specifically, because ECC was terminated for failing to complete its work on time, ECC's assertions of excusable delay are fairly characterized as "any other admissible matter which might have been offered for [the] purpose" of challenging its termination for default. *Nevada*, 463 U.S. at 129–30. The Court finds that ECC, as the master of its appeal, should have brought its excusable delay claims to the CO to properly assert them in the ASBCA litigation. *See Avant*, 159 Fed. Cl. at 638. Because its termination for default was the subject of that appeal, any plausible defense ECC had to convert that termination to one of that of convenience was required to be brought first to the CO and then to the venue of its leisure. Unfortunately, ECC failed to promptly bring those claims. Allowing correction well after the fact runs counter to the basic tenets of claim preclusion. ECC "was obligated to prosecute [those] claims in the same proceeding," *Phillips/May*, 524 F.3d at 1267. The fact that it could not was by their own hand.

As to the third prong of claim preclusion, there can be no doubt that this suit is based on the same set of transactional facts as the litigation before the ASBCA. *See Ammex*, 334 F.3d at 1055. This litigation and the ASBCA proceeding each stem from the same contract, the same task order, and the same course of events leading to the same termination for default. The Federal Circuit clarified that the general rule is that all claims arising out of the same contract constitute the same claim for purposes of res judicata, such that "claims under a single contract generally must be brought together." *Phillips/May*, 524 F.3d at 1271, 1273. However, a contractor may "overcome this presumption by showing that the claims are unrelated." *Id.*, 524 F.3d at 1272. ECC cannot overcome such a presumption because its termination for failing to complete work on time is intrinsically related to the claims that its untimeliness was due to excusable delays or time extensions owed.

Because ECC was in full control of evoking the ASBCA's jurisdiction to hear its claims prior to appealing to the ASBCA, it may not "proceed to piecemeal litigation of its claims through selectively creating or limiting ASBCA's or this Court's jurisdiction over its claims." *Avant*, 159 Fed. Cl. at 639. Accordingly, Counts I, II, and III (excusable delays/time extensions) and Count V (termination for default) are precluded from being raised in this Court. Holding otherwise would run afoul of principles of claim preclusion.

As to the United States' remaining arguments specific to issue preclusion, violations of statutes of limitations, and propriety of asserted damages, those arguments are rendered moot. Therefore, the Court will not address the substance of those arguments.

2.   <u>Genuine issue of material fact exists as to Count IV.</u>

As to Count IV, ECC alleges that the CPARS "was issued in violation of FAR 42.1503(d), as the final CPARS rating was never submitted to ECC[ ] for comment, nor was it

submitted to the CO's superior for resolution of any disputes between the parties." (Sec. Am. Compl. ¶ 90). The first component of this claim invokes FAR 42.1503(d), iterating that "evaluations of contractor performance, including both negative and positive evaluations, . . . shall be provided to the contractor as soon as practicable after completion of the evaluation." Under the same subpart, the "contractor will receive a CPARS–system generated notification when an evaluation is ready for comment." FAR 42.1503(d).

The United States argues that the record contradicts ECC's allegation and the argument fails as a matter of law. (Def.'s Mot. Summ. J. at 38). In the hearing before the ASBCA, counsel for ECC admitted that ECC did receive the CPARS notifications, but "[t]he employee, or former employee at ECC [that] received the CPARS traffic for this project . . . was no longer employed by ECC when the [CO] was sending the updates after termination." (Def.'s Mot. Summ. J. A2796). Indeed, CPARS's user access records for this contract show that Jeff Leptrone ("Mr. Leptrone") was the contractor representative, (*Id*. A2787), and counsel for ECC before the ASBCA confirmed that Mr. Leptrone was the former employee ECC designated as recipient of CPARS traffic. (*Id*. A2796). The CPARS activity log shows that the evaluation was sent to ECC's contractor representative on April 27, 2016. (*Id*. A2787). The log also shows that reminder emails were sent to ECC's contractor representative six more times over the sixty-day review period to remind ECC's contractor representative to complete their review. (*Id*. A2785–86). On June 27, 2016, ECC's sixty-day review period in the CPARS system expired, and the evaluation was "[f]inalized and sent to the Reviewing Official" as the "Contractor Rep[resentative] [was] non-responsive." (*Id*. A2786).

ECC responds to the United States' argument with a declaration from Mr. Christian Canon ("Mr. Canon"), Director of Contracts & Procurement for ECC and its subsidiaries. (Canon Decl., ECF No. 71-1). According to Mr. Canon, "Mr. Leptrone left [ECC] employment during the course of performance" of this contract; thus, Mr. Canon sent the CO "an email requesting that all TQ contract matters be referred to [him] to handle[,]" including the CPARS communications. (*Id*. at 5). Despite this purported request, Mr. Canon did not receive the CPARS rating as required. (*Id*.). By the United States' admission, CPARS communications were still sent to the previous ECC representative, not Mr. Canon, and no substitution was made. (Tr. 28:20–22 (Defendant's Counsel: "There's nothing on here that suggests that any substitution was ever made [in reference to the CPARS communications].")). This affidavit is significantly probative. Therefore, it is unclear on the record before the Court whether these communications were sent to the correct representative and the propriety of the CPARS rating is in question.

A trial court has the discretion to deny even a well-supported motion for summary judgment if it believes the case would benefit from a full hearing. *Lowery v. United States*, __ Fed. Cl. __, 2023 WL 4677537, at *5 (Fed. Cl. July 21, 2023) (citing *United States v. Certain Real & Pers. Prop. Belonging to Hayes*, 943 F.2d 1292 (11th Cir. 1991)). As to Count IV, there is a genuine issue of material fact as to whether the USACE's CO sent these communications to the correct ECC representative. That said, the United States represented to the Court that this may no longer be a source of harm to ECC. (Tr. 39:3–12 (Defendant's Counsel, in relevant part: "[W]e have some concerns that the CPARS rating that they are, in fact, challenging may no longer even be accessible. So it's not really a source of harm . . . . That's something I'd like to discuss with Plaintiff's counsel offline, and maybe we can resolve it among ourselves.")). Thus, for efficiency purposes, the Court will allow the parties to discuss how to best litigate this claim.

### III.    Conclusion

As explained above, ECC's claims related to excusable delay and termination for default are precluded by the ASBCA decision. Therefore, Counts I, II, III, and V must be dismissed. However, genuine issue exists as to whether the United States gave proper notice of ECC's CPARS rating, thus Count IV remains viable. The United States' Motion for Summary Judgment, (ECF No. 60), is **GRANTED-IN-PART** and **DENIED-IN-PART**. On or before **September 12, 2023**, the parties are ordered to submit a Joint Status Report proposing a litigation schedule as to Count IV.

Several other pending motions must be addressed. A total of four motions in limine, (ECF Nos. 61, 70–72), are rendered moot by this decision. (Tr. 40:12–15 (ECC counsel agreeing that no motion in limine is relevant to Count IV)). Therefore, the Court **DENIES** those motions as **MOOT**. Furthermore, given the rulings in this Opinion and to allow the parties to potentially resolve Count IV, the Motion to Continue the Trial Date, (ECF No. 76), is **GRANTED**. Finally, the United States moved for clarification of a previous order related to the timeliness of various filings. (ECF No. 78). Finding that the Final Pretrial Conference provided clarification, the Court also **DENIES** that motion as **MOOT**, but **GRANTS** the alternative relief and accepts the United States' Reply brief.

**IT IS SO ORDERED.**



s/   David A. Tapp
DAVID A. TAPP, Judge